**4000 OLD PALI ROAD PARTNERS**, a Hawai'i general partnership, Plaintiff–Appellee, v. **LONE STAR OF KAUA'I, INC.**, a Hawai'i corporation, doing business as **JIMMY'S GRILL, LONESTAR KAUA'I**, a Hawai'i general partnership, doing business as **JIMMY'S GRILL, RICHARD JASPER**, aka **RICH JASPER, JAMES JASPER II**, aka **JIM JASPER, JR., JAMES T. JASPER, JENNIFER JASPER, JOHN DOES 1–10, DOE PARTNERSHIPS 1–10, DOE CORPORATIONS 1–10**, and **DOE ENTITIES 1–10,** Defendants–Appellants

NO. 15675

(CIV. NO. KA–91–29)

NOVEMBER 5, 1993

BURNS, C.J., HEEN, J., AND CIRCUIT JUDGE SHIMABUKURO, IN PLACE OF ASSOCIATE JUDGE WATANABE, RECUSED

OPINION OF THE COURT BY BURNS, C.J.

Plaintiff 4000 Old Pali Road Partners (4000 OPRP) is the owner of the Hee Fat Marketplace (HFM) in Kapaʻa, Kauaʻi. Defendant–Counterclaimant Lone Star of Kauaʻi, Inc. (LSKI), is the lessee of space in the HFM in which it operates a restaurant and cocktail lounge under the name "Jimmy's Grill." Defendants Richard Jasper (Richard) and Jimmy Jasper, Jr. (Jimmy) are officers, directors, and shareholders of LSKI and guarantors of LSKI's performance of the lease. LSKI; Richard, and Jimmy (collectively Defendants) appeal the district court's October 24, 1991 judgment which awards (1) to 4000 OPRP as plaintiff: a writ of possession of the leased premises on October 27, 1991; judgment against Defendants for $4,000.00 for the increased cost of an appraisal and $456.48 for the cost of the audit; and reasonable attorney fees and costs; and (2) to Defendants as counterclaimants: judgment against 4000 OPRP for $130.00, plus attorney fees of $32.50 pursuant to Hawaiʻi Revised Statutes (HRS) section 607–14 (1985).

In response to Defendants' motion for a stay based on District Court Rules of Civil Procedure Rule 62(d), the district court entered identical orders on October 25, 1991 and November 19, 1991 approving a supersedeas bond

and staying the enforcement of the October 24, 1991 judgment pending this appeal.

We affirm (1) the order to issue a writ of possession in favor of 4000 OPRP and against Defendants; (2) the order requiring Defendants to pay 4000 OPRP's reasonable costs and attorney fees; and (3) the judgment in favor of Defendants and against 4000 OPRP in the amount of $130.00 plus attorney fees of $32.50. We reverse the judgment in favor of 4000 OPRP and against Defendants in the sum of $4,456.48.

## FACTS

The landlord–tenant relationship between 4000 OPRP and LSKI is governed by the following documents dated September 15, 1986: (1) Standard Form Lease comprised of (a) Specific Lease Provisions and (b) General Lease Provisions; and (2) an Amendment and Addendum to Standard Form Store Lease. Together, these documents are the Lease.

The Specific Lease Provisions state in relevant part as follows:

### SECTION II

### PURPOSE:  CONDUCT OF BUSINESS

During the period of this lease, the Tenant shall maintain and operate in the Demised Premises the following business and no other:  Restaurant, Cocktail Lounge and Corporate Business Office . . . .

### SECTION III

### TERM

A.   Duration and Commencement:

The term of this lease shall be for a period of twenty (20) years and no (no) months, commencing . . . not later than June 1, 1987.

\* \* \*

## SECTION IV

## RENTAL

A.  Guaranteed Minimum and Percentage Rentals and Gross Income Tax:

The Tenant agrees to pay as rental for the use and occupancy of the Demised Premises at the times and in the manner hereinafter provided, the following sums of money:

(1)  Minimum Annual Rental:  [Spaces left blank.]

\* \* \*

(2)  Percentage Rental:  In addition to the minimum annual rentals hereinabove agreed to be paid by Tenant, Tenant shall and will pay to Landlord, at the times and in the manner hereinafter specified, an additional rental in an amount equal to seven percent (7%) of all gross sales (as gross sales are hereinafter defined) in excess of 14.29 times the minimum rental, made during each leasehold year during the term hereof, in, upon and from the Demised Premises.  Such percentage rental shall be computed each calendar month.  On or before the fifteenth (15th) day of each calendar month during the term and any extension or renewal of the term of this lease (including the calendar month next succeeding the last month of the term hereof), Tenant shall deliver to Landlord a written statement signed and certified by Tenant or an officer of Tenant

as being true and correct, setting forth the amount of Tenant's Gross Sales during the calendar month immediately preceding, and on the same day Tenant shall pay Landlord the full amount of the Percentage Rental for such calendar month immediately preceding. Within the thirty (30) day period next succeeding the end of each Lease Year of the term hereof, Tenant shall deliver to Landlord a written statement, signed and certified by a certified public accountant to be true and correct, setting forth the total amount of Tenant's Gross Sales made during the immediately preceding Lease Year, and Tenant shall concurrently therewith, pay Landlord the full balance of the Percentage Rental due hereunder for such Lease Year. . . .

The General Lease Provisions state in relevant part as follows:

## ARTICLE 4

### GROSS SALES

A.    Gross Sales Defined:

The term "Gross Sales" as used in this Lease is hereby defined to be the aggregate selling price of all merchandise and services sold in, upon and from the Premises by Tenant, its subtenants, licensees and  concessionaires, personally, by mail order, or from salesmen operating out of the Premises where such sales are not made in, upon or from the Premises, or from any vending or coin–operated or token–operated device, whether for cash or on credit, . . .

* * *

## ARTICLE 5

## RECORDS AND BOOKS OF ACCOUNT

A. Cash Registers:

Tenant shall install, . . . , a cash register or registers of a type acceptable to and approved by Landlord, and all such cash registers shall be equipped with a cumulative totaling device which shall be sealed and a daily dated continuous tape on which all Gross Sales shall be recorded and imprinted and which shall indicate any separate department by which such sales were made. Tenant shall retain or cause to be retained intact the daily dated continuous tapes from each such cash register for a period of two (2) years during which period Landlord shall be entitled to inspect the same. . . .

B. Records:

Tenant, . . . shall keep and maintain complete, accurate and customary records and books of account of all sales, whether for cash or on credit, and all business transactions made in, upon or from the Premises during each Lease Year, and the same shall be retained intact for a period of not less than two (2) years after the end of the Lease Year to which said records and books of account pertain. Landlord shall be entitled at all reasonable times during business hours, either at the Premises or such other office of Tenant at which said records and books of account may be kept, through Landlord's duly authorized agents, attorneys or accountants, to inspect and make copies of any and all of such records and books of account, including copies of any sales tax or gross

receipts or information returns required by or furnished to any governmental authority, together with any and all other records and documents in any way bearing on Tenant's Gross Sales as herein defined.

C. Audit:

Landlord shall be entitled at any time to cause an audit to be made by any person authorized by Landlord of all records and books of account required to be kept hereunder together with all supporting data relating thereto, and if such audit discloses that Tenant's Gross Sales as previously reported for the period audited were understated, Tenant shall immediately pay to Landlord the additional Percentage Rental due for the period audited, together with interest at eighteen percent [per] annum on such shortage of rental from the time such rental became due, and if such understatement was in excess of one per cent (1%) of Tenant's actual Gross Sales as disclosed by such audit, Tenant shall immediately pay to Landlord the cost of such audit. If such understatement was in excess of five percent (5%) of Tenant's actual Gross Sales as disclosed by such audit, Landlord may, at its option, terminate this lease upon 30 days notice to Tenant, in addition to any other remedies available to Landlord.

\* \* \*

## ARTICLE 18

### DEFAULT

A.  Notice and Termination, Landlord's Options:
    In the event that:

(1) Tenant shall default in the payment of any sum of money required to be paid hereunder and such default continues for three (3) days after written notice thereof from Landlord to Tenant; or

\* \* \*

(3) Tenant shall default in the performance of any other provision, covenant or condition of this Lease on the part of Tenant to be kept and performed and such default continues for thirty (30) days after written notice thereof from Landlord to Tenant, provided however, that if the default complained of in such notice is of such a nature that the same can be rectified or cured, but cannot with reasonable diligence be done within said thirty (30) day period, then such default shall be deemed to be rectified or cured if Tenant shall, within said thirty (30) day period, commence to rectify and cure the same and shall thereafter complete such rectification and cure with all due diligence, and in any event within sixty (60) days from the date of giving such notice; or

\* \* \*

(5) . . . ; then and in any such event (and in addition to all other rights and remedies it may have according to this Lease or by law provided) Landlord, at its option, shall have the following rights:

(a) The right to declare the term of this Lease ended and to re–enter the Premises and take possession thereof, and to terminate all of the rights of Tenant in and to the Premises; or

* * *

E. Waiver of Default:

The waiver by Landlord of any default or breach of any of the provisions, covenants or conditions hereof on the part of Tenant to be kept and performed shall not be a waiver of any preceding or subsequent breach of the same or any other provision, covenant or condition contained herein. The subsequent acceptance of rent or any other payment hereunder by Tenant to Landlord shall not be construed to be a waiver of any preceding breach by Tenant of any provisions, covenant or condition of this Lease other than the failure of Tenant to pay the particular rental or other payment or portion thereof so accepted, regardless of Landlord's knowledge of such preceding breach at the time of acceptance of such rental or other payment.

* * *

The Amendment and Addendum to Standard Form Store Lease (the Amendment) states in relevant part as follows:

This Agreement is made and entered into between [Landlord] and [Tenant]. This Agreement shall amend and add to [the Lease]. To the extent inconsistent therewith, [the Amendment] shall control. It is understood between the parties that the Lease is a pre–printed form, much of which was not the subject of negotiation between the parties, and it is agreed that the intent and language of this Agreement shall control over any contrary intent and language in the Lease.

Matters not inconsistent herewith shall be governed and controlled by the Lease.

It is therefore agreed as follows:

The Standard Form Store Lease ("the Lease") between the parties hereto is hereby amended and added to as follows:

1. There is no minimum rent for the Premises. The rent for the Premises during the first five years after the commencement date shall be seven percent of gross sales as defined in the Lease.

2. For the sixth through the twentieth years the rent shall be nine percent of gross sales as defined in the Lease. . . .

\* \* \*

6. Tenant shall have an option to enter into a new Lease for a 20–year term, on reasonable terms and conditions other than rent. . . .

7. All reports of Tenant regarding sales (for calcualtion [sic] of percentage rent) shall be signed and certified accurate by Tenant. Landlord may cause an audit of Tenant's sales records to determine accuracy of sales figures. In the event of a miscalculation of total sales in excess of five percent, Tenant shall pay for all reasonable expense of such audit, and shall pay all rental found due forthwith. This shall be Landlord's remedy for underpayment of rent.

8. Tenant's address for notice shall be P. O. Box 574, Lihue, Kauai, Hawaii 96766.

9. Article 18 of this Lease is amended to provide that Tenant shall not be in default for payment of monetary obligations unless the failure to pay shall continue for a period of 30 days

after receipt of notice from Landlord, during which period of time Tenant shall have the right to cure any such default. After 10 days' delinquency, a 20% late charge on the delinquent amount shall be payable as additional rent. As to any non–monetary default, Tenant shall have 90 days after notice in which to cure such default. As to any such non–monetary default, the commencement by Tenant of curative action within 30 days of receipt of notice and the diligent prosecution of correction shall entitle Tenant to such additional time as is reasonably required to correct any non–monetary default.

* * *

17. Section IV(A) is hereby amended to provide that there shall be no guaranteed minimum rent and all materiala [sic] prior to subsection A(2) is deleted and all portions of subparagraph 2 other than the specification of seven percent of gross sales as percentage rental, the timing of payment and certifications are deleted. . . .

* * *

19. Subparagraph 4(d) of Section IV is amended to provide that a service charge shall be payable only if payments are not made within 10 days after they become due and payable.

* * *

25. A new subparagraph 6 of paragraph 4(A) is added as follows: No percentage rental shall be payable upon any sales for which Tenant has not received payment, and deductions to sales totals shall be made for any refunds actually paid to any

customer of Tenant from sales otherwise subject to payment of rent.

Monthly, Defendants paid percentage rent based on the monthly total of the daily sales. Amy Hayashi (Hayashi), HFM's property manager, testified that she retained Hawaiian Appraisal Council (HAC) to do an appraisal of HFM for use in obtaining a bank loan. By letter dated July 20, 1990, HAC asked Defendants for "monthly gross sales figures beginning with the first month of operation through and including February 1989." Defendants' response did not satisfy Hayashi. She testified that she asked:

"Jimmy, are you reporting your T–shirt sales to us?"

And Jimmy said, "No, I don't have to. Go check the lease," which I promptly did.

Further investigation caused Hayashi to schedule an audit which she conducted on December 6, 1990. Michael H. Nekoba (Nekoba), a CPA with the accounting firm of Pannell Kerr Forster, represented Defendants. According to the record, the audit and inquiry revealed the following relevant facts:

1. The bar was downstairs and the restaurant was upstairs. The restaurant used a cash and carry system where each waitress was her own bank. When a waitress ended her shift, she turned in her sales chits, cash, travelers checks, and charge card receipts. The restaurant did not have a cash register. The bar had a cash register but it was not equipped with a sealed cumulative totaling device. In addition to selling food and liquor at the premises, LSKI also sold apparel bearing the logo of Jimmy's Grill. T–shirts were the primary item of apparel. Richard testified that Jimmy's Grill gave away approximately fifty

per cent of its T–shirts. LSKI's mark–up on T–shirt sales was 100% on average.

2. At times, LSKI purchased Jimmy's Grill apparel with cash. At times, the father of Jimmy and Richard purchased Jimmy's Grill apparel for LSKI with cash. At least some of the cash purchases of apparel were not reported by LSKI as costs for income tax purposes.

3. LSKI maintained a daily sales journal listing the following two totals of the sales from the premises (A) the combined total of the restaurant and apparel sales, and (B) the total of the bar sales. LSKI attached all charge card slips to the daily sales journals. It reported LSKI's monthly receipts to 4000 OPRP on a form supplied by 4000 OPRP. It discarded the sales chits and cash register tapes 60–90 days later. Nekoba testified that without the sales chits and cash register tapes, it was impossible to audit the reported sales. In his view, the only way for the landlord to verify the numbers was to do "what the IRS would do in a fraud audit, which is, what they do is they subpoena all of your bank records and ask you to explain all your deposits."

4. Nekoba's review revealed that LSKI had erred when it added the amounts reported in its daily sales journals. These errors of addition caused an underreporting of $92,530.38 of sales (excluding gross income taxes) for the 1989–1990 period. The additional rent due was $6,477.13 plus 4.167% general excise tax, or $6,747.03. Since the revised total of the sales for that period was $1,924,400 (excluding gross income taxes), the discrepancy was 4.80827%. Inexplicably, LSKI's error in under–reporting its gross income for gross income tax purposes during the same period was only $69,468.

After correcting LSKI's errors of addition, LSKI's reported gross sales were as follows:

| Month | 1988 | 1989 | 1990 | 1991 |
|---|---|---|---|---|
| January | 18,691 | 87,845 | 71,310 | 40,340 |
| February | 52,148 | 87,566 | 44,065 | |
| March | 58,467 | 112,914 | 80,672 | |
| April | 59,090 | 100,089 | 86,048 | |
| May | 54,360 | 104,029 | 87,580 | |
| June | 53,515 | 117,433 | 75,316 | |
| July | 54,936 | 13,092 | 77,223 | |
| August | 80,906 | 25,313 | 78,698 | |
| September | 60,397 | 96,805 | 75,167 | |
| October | 80,274 | 91,391 | 67,495 | |
| November | 68,953 | 88,091 | 56,196 | |
| December | 70,819 | 77,038 | 48,718 | |
| TOTAL | 712,556 | 1,201,606 | 848,488 | |

5. LSKI's 1989 gross income was $1,201,606. Of that amount, $752,555 was for food and apparel. Nekoba testified that he could only estimate the gross receipts from apparel sales. He estimated that the gross receipts for T–shirt sales in 1989 was $110,961. Jimmy or Richard told him they were selling $700 per day. Nekoba testified that "the food side is slow, and without the bar and the T–shirt business they would be out of business."

By letter dated January 29, 1991, a lawyer representing 4000 OPRP advised LSKI as follows:

> We are in receipt of your letter of January 21, 1991 and the check for $6,747.03. My client intends to cash the check without prejudice to its position that the terms of the lease have been breached by the failure to report all gross sales

as required by the lease. The notable absence of certain cash register tapes and the fact that the t–shirt sales were for cash and no records were kept of such sales only reinforce our contention that the terms of the lease have been breached.

On February 5, 1991, 4000 OPRP filed its Complaint for Summary Possession and Damages against Defendants. Defendants were served on February 7, 1991. The case was tried on June 10 and argued on June 25, 1991. When the argument concluded, the judge stated in relevant part as follows:

And although it is a very, you know, harsh remedy I don't feel the Court has any other option but to award the termination because of the lack of other remedies that can be proposed.

And the reason [4000 OPRP] cannot come up with any figures to come up with the actual under payment that they're saying occurred —

And I'm not saying that there is deliberate under payment or, you know, this is intentional on any part, you know, by [Defendants].

What I'm saying is that there is no way for [4000 OPRP] to come up with a figure and that is because the records are just not kept in the manner that I think is customary here.

\* \* \*

I don't know what other, you know, way to fashion a remedy for this.

If you have termination I think there are other equitable factors which would include what improvements [Defendants] have put into the place.

The district court entered Findings of Fact (FOF) and Conclusions of Law (COL) in relevant part as follows:

## FINDINGS OF FACT

\* \* \*

9. The Lease sets forth in specific detail the obligations of Defendant, as Tenant, to maintain records for a period of not less than two years of the gross sales of all business conducted on the Demised Premises. There are no prerequisites to Defendant's duty to comply with the record–keeping requirements of the Lease. None of the provisions of the Amendment relate in any way to the Defendant's record–keeping requirements set forth in the Lease.

10. The record–keeping requirements set forth in Section 5 of the Lease include the obligation to install and use sealed cash registers and keep the tapes from such cash registers for a period of not less than two years. There is no provision in the Lease that Defendant must be given advance notice of its obligation to install and use sealed cash registers. None of the provisions of the Amendment relate in any way to the Lease provisions regarding the installation and use of cash registers.

11. The Lease gives Plaintiff the explicit right to re–enter the Demised Premises and terminate the Lease in the event that, *inter alia*, Defendant defaults in the payment of any sum required to be paid under the Lease or Defendant defaults in the performance of any other provision, covenant or condition of the Lease.

12. Defendant has not properly recorded and maintained records of the T–shirt sales at Jimmy's Grill for the required two–year period;

the sales figures for the T–shirts provided to Plaintiff are just an estimate because there is "no way of knowing exactly what the amount was"; there is no way for anyone to reconstruct what the actual T–shirt sales were during the past two years because Jimmy's Grill never kept the sales chits and cash register tapes for the T–shirt sales; Jimmy's Grill never kept sales chits and cash register tapes for food and liquor sales; there is no means to verify Jimmy's Grill's records of its food costs; it is "impossible" to certify that the gross sales figures for Jimmy's Grill are accurate because of Jimmy's Grill's failure to make or maintain accurate records of the T–shirt sales; Jimmy's Grill's figures for the gross sales of Jimmy's Grill are an "estimate" of gross sales which is itself based on "estimates" of the ratio of food costs to food sales of the gross sales of T–shirts and the price charged for the T–shirts.

13.   Jimmy's Grill bought the T–shirts, which are subsequently sold on the Demised Premises, with cash and did not report the purchase of the T–shirts until confronted by Plaintiff during the course of the sales audit.

14.   Defendant has not complied with the record–keeping requirements set forth in the Lease in that Defendant has failed to record and report all of its gross sales over the past two years, that Defendant has failed to install and use sealed cash registers and that as a result of its failure to record all of its gross sales, there is no means by which to account for or ascertain the amount of the unrecorded gross sales.

15. As a result of Defendant's failure to comply with the record–keeping requirements in the Lease, Plaintiff incurred $4,000 of additional costs for an appraisal of the Demised Premises because of the additional time necessary to appraise the Demised Premises in the absence of the books and records required to be kept pursuant to the Lease.

\* \* \*

17. The Lease provides, in Article 18, that "should Landlord at any time terminate this Lease for any default, breach or failure of Tenant hereunder, then, in addition to any other rights or remedies available to Landlord hereunder or by law provided, Landlord may have and recover from Tenant . . . all costs of recovering the Premises including, without limitation, court costs and reasonable attorney's fees for services in recovering possession . . . ."

\* \* \*

## CONCLUSIONS OF LAW

1. Some of the provisions of the Amendment modify or amend some of the clauses of Article 18 of the Lease. The amendment does not affect Defendant's obligation to keep and maintain records as set forth in Section 5 of the Lease and the amendment does not affect Plaintiff's rights, as Landlord, to re–enter the Demised Premises or to terminate the Lease.

2. As a result of Defendant's failure to record all gross sales and to maintain records of such gross sales, as required by the Lease, the

gross sales recorded and reported by Defendant are only an "estimate" which eludes meaningful verification. As such, Plaintiff is deprived of the benefit for which it bargained: rental payments equivalent to a percentage of Defendant's gross sales and the right to verify that the gross sales reported to it are the true gross sales.

3. The provisions of Article 5 of the Lease, regarding the requirements that Defendant maintain cash registers and records and books of account is worded explicitly and unambiguously so as to provide adequate notice to Defendant of Defendant's obligations thereunder.

4. Defendant's failure to maintain the records of its gross sales as required by the Lease constitutes a material breach of the Lease.

5. Forfeiture is the only remedy appropriate to this case because, as a result of Defendant's breach, it is impossible to ascertain the amount of damage caused by such breach and the exact amount of compensation can never be calculated.

6. Relief from forfeiture is unavailable to Defendant because the considerations which orginally moved Plaintiff to enter into its lease have been irretrievably compromised and because Defendant's failure to record its gross sales as required by the Lease is grossly negligent.

7. Defendant has forfeited all rights and interest in the Lease, the Lease is ended and Plaintiff is entitled to repossess the Demised Premises.

8. Plaintiff is entitled to $4,000 for the increase in the cost of the appraisal as a result of

Defendant's failure to comply with the record-keeping requirements of the Lease. Plaintiff is also entitled to $456.48 for the cost of the audit.

9. Plaintiff is entitled to all costs and reasonable attorney's fees expended in recovering possession of the Demised Premises.

## DISCUSSION

### A.

Defendants challenge FOF 11 and COL 1. We agree that FOF 11 and COL 1 fail to recognize the amending effect of paragraph 9 of the Amendment which states in relevant part as follows:

9. . . . Tenant shall not be in default for payment of monetary obligations unless the failure to pay shall continue for a period of 30 days after receipt of notice from Landlord, during which period of time Tenant shall have the right to cure any such default. . . . As to any non-monetary default, Tenant shall have 90 days after notice in which to cure such default. As to any such non-monetary default, the commencement by Tenant of curative action within 30 days of receipt of notice and the diligent prosecution of correction shall entitle Tenant to such additional time as is reasonably required to correct any non-monetary default.

However, we conclude that the district court's error is not fatal to its October 24, 1991 judgment.

### B.

Defendants challenge FOF Nos. 12 and 14, and COL Nos. 2 and 5. FOF 12 and 14 state in relevant part as follows:

12. . . . Jimmy's Grill's figures for the gross sales of Jimmy's Grill are an "estimate" of gross sales which is itself based on "estimates" of the ratio of food costs to food sales of the gross sales of T–shirts and the price charged for the T–shirts.

14. . . . there is no means by which to account for or ascertain the amount of the unrecorded gross sales.

COL Nos. 2 and 5 state in relevant part as follows:

2.   As a result of Defendant's failure to record all gross sales . . . the gross sales recorded and reported by Defendant are only an "estimate" which eludes meaningful verification. . . .

5.   Forfeiture is the only remedy appropriate to this case because, as a result of Defendant's breach, it is impossible to ascertain the amount of damage caused by such breach and the exact amount of compensation can never be calculated.

According to these findings and conclusions, the district court's decision is based not only on LSKI's failure to record each sale in the manner required by the lease and to keep the records for the period of time required by the lease, but also on the "facts" that LSKI did not record some of the gross sales; all of the gross sales recorded and reported by LSKI are only an estimate; and 4000 OPRP received less percentage rent than was due. A review of the record reveals no substantial evidence to support these "facts." There is no substantial evidence of any unrecorded gross sales or that LSKI did not daily record the total of all of its gross sales. When the trial began, 4000 OPRP thought LSKI was not including receipts from the sale of apparel in its reported gross sales. Hayashi testified that Jimmy told her that the lease did not require

LSKI to report T–shirt sales. However, no other witness was asked about that alleged statement. Moreover, when viewed in context, the record reveals that Jimmy was referring to the fact that the lease did not require LSKI to report T–shirt sales separately from food and beverage sales. Jimmy and Richard testified that LSKI reported all receipts from food, apparel, and beverage in its daily sales reports. The concept of "estimate" arose when Nekoba was asked if he could tell what the gross receipts were from the sale of T–shirts. Obviously, since LSKI did not segregate the food and apparel receipts by source, the best Nekoba could do was estimate. Nekoba's testimony does not support a finding that the total of the gross receipts LSKI reported for the sale of food, apparel and beverage were estimates.

However, we conclude that the district court's error is not fatal to its October 24, 1991 judgment.

## C.

Defendants challenge FOF 9, 10, 12, 14, and 15 and COL Nos. 2, 3, 5, 6, 7 and 9. Defendants contend that (1) LSKI's default did not constitute a material default; (2) under the Amendment, 4000 OPRP's exclusive remedy for underpayment of rent is, at the maximum, payment of the cost of an audit and the deficiency found therein; and (3) because notice must be given for any non–monetary preliminary defaults, LSKI could not be held in non–monetary ultimate default without notice and an opportunity to cure. We will discuss these contentions in order.

### (1)

Defendants contend that LSKI's default did not constitute a material default. We disagree. We agree with the view that "[a] tenant's maintenance of records and supplying landlord with statements of sales is essential to

operation of a percentage lease." M. Friedman, 1 *Friedman on Leases* § 6.5, at 216 (3d ed. 1990). Therefore, we conclude that LSKI's failure to record each sale in the manner required by the lease and to keep the records for the period of time required by the lease was a material default of the percentage lease. Moreover, Defendants did not appeal COL 4 which concludes that their failure to maintain records of the gross sales as required by the lease was a material default of the lease.

### (2)

Defendants note that the Amendment states that 4000 OPRP's exclusive maximum remedy for underpayment of rent is the payment of the cost of an audit and the deficiency found therein. This fact, however, is irrelevant. The relevant material defaults supporting the judgment in this case do not include the underpayment of rent. The relevant material defaults are LSKI's failures to record each sale in the manner required by the lease and to keep the record for the period of time required by the lease.

### (3)

Defendants contend that because notice was required to be given of any non–monetary preliminary defaults, LSKI could not be in ultimate default without prior notice and an opportunity to cure.

We agree that LSKI's failure to record each sale in the manner required by the lease and to keep the records for the period of time required by the lease were non–monetary preliminary defaults. As to any non–monetary preliminary default, LSKI had 90 days after notice in which to cure such preliminary default. If LSKI commenced curative action within 30 days of receipt of notice

and diligently prosecuted correction, it would be entitled to such additional time as was reasonably required to correct the preliminary default.

4000 OPRP responds that where a tenant irremediably defaults on a lease so that the default cannot be cured within the period allowed for cure, courts readily find that notice and opportunity to cure are unnecessary prerequisites to landlord's remedy. It cites *Taylor v. Gill Street Investments*, 743 P.2d 345, 348 (Alaska 1987); *Coronado Company, Inc. v. Jacome's Department Store, Inc.*, 129 Ariz. 137, 140, 629 P.2d 553, 556 (Ct. App. 1981); *Poundstone v. Gofoor*, 104 Cal. App. 212, 216, 285 P. 403, 405 (1930); *Matthews v. Digges*, 45 Cal. App. 561, 564–65, 188 P. 283, 285 (1920). 4000 OPRP contends that LSKI's defaults were irremediable because "[t]here is no way for [LSKI] to turn back the clock to 1989 and 1990 and keep accurate and honest records of actual sales consummated on the Leased Premises, as required by the Lease and Amendment." We agree that there is no evidence that LSKI can comply precisely with the record keeping requirements for 1989 and 1990. However, that does not mean that LSKI cannot, in some alternate way, cure such preliminary default by proving the accuracy of its records. We cannot conclude, as a matter of law, that LSKI's preliminary defaults were irremediable.

Alternatively, 4000 OPRP also contends that if notice was required, their January 29, 1991 letter, and/or the service of the complaint on February 7, 1991, satisfied the notice requirement because, by the time the trial commenced on June 10, 1991, LSKI had not remedied or cured its preliminary defaults. Under the facts of this case, we agree.

According to paragraph 9 of the Amendment, LSKI is not in ultimate default until it (A) receives notice of the preliminary default; and (B) has had 30 or 90 days after notice of the preliminary default in which to cure it. The January 29, 1991 letter was a notice of the following alleged preliminary defaults: (1) failure to report all gross sales; (2) absence of cash register tapes; (3) liability for rent due in excess of 5%. Although LSKI was legally entitled to no less than 90 days after January 29, 1991 in which to cure preliminary defaults (1) and (2) and 30 days in which to cure preliminary default (3), 4000 OPRP filed its suit on February 5, 1991.

This is a summary possession case in district court. What is the district court's appropriate response when the tenant objects to the fact that the landlord's summary possession complaint was filed after the tenant was notified of the preliminary defaults but before the tenant's cure period has expired? This appears to be an issue of first impression. We conclude that it depends on the timing of tenant's objection to the timing of the complaint.

LSKI was not in ultimate default until 30 or 90 days after the January 29, 1991 notice. 4000 OPRP did not have grounds to file a complaint until LSKI was in ultimate default. Court rules afforded LSKI an additional period of time before summary judgment could have been entered. The Lease contemplates these time periods in favor of LSKI. 4000 OPRP cannot unilaterally advance them or shorten them. The clock runs on 4000 OPRP's time, not on LSKI's or the court's. Thus if the tenant, before the expiration of the cure period or the commencement of the trial, moves for dismissal of the landlord's complaint on the ground that it was filed prematurely, landlord's complaint should be dismissed. In that situation, the parties experience exactly what they bargained

for and the court is not prematurely involved in the merits of the case.

On the other hand, if the tenant, after the expiration of the cure period and the commencement of the trial, moves for dismissal of the complaint on the ground that it was filed prematurely, it would be an unreasonable benefit to the tenant, burden on the landlord, preference for form over substance, and waste of judicial resources to dismiss the complaint and require the landlord to file a new complaint. In that situation, the landlord's complaint should not be dismissed.

In this case, the second scenario occurred. Therefore, 4000 OPRP's premature filing of its complaint was inconsequential.

## (D)

The Hawai'i Supreme Court concluded, in *Queen Emma Foundation v. Tingco*, 74 Haw. 294, 845 P.2d 1186 (1992), that a lessor seeking to dispossess a lessee of a long–term lease of residential property must file the complaint in circuit court because title to real estate is in question. The *Tingco* rule, however, does not apply to LSKI's case which deals with a medium–term lease of commercial property.

## (E)

Defendants contend that principles of equity require a balancing of interests, which the district court did not perform. We disagree that principles of equity are applicable. This was a summary possession case in the district court. The district court lacks equity jurisdiction. *American Sec. Bank v. Nishihara*, 3 Haw. App. 594, 599, 656 P.2d 1347, 1352 (Haw. App. 1983).

In *Lum v. Sun*, 70 Haw. 288, 769 P.2d 1091 (1989), the Hawai'i Supreme Court held that the district court has the exclusive jurisdiction to adjudicate the summary possession claim and that when a timely demand for a jury trial [is] made pertaining to other claims, counterclaims, and legal and equity issues, those matters should be transferred to the circuit court for trial by jury. Thus, it follows that if Defendants wanted their equity issues adjudicated, it was their burden to initiate appropriate proceedings in the circuit court.

Moreover, the rule in equity is that "where the lessee's breach has not been due to gross negligence, or to persistent and wilful conduct on his part, and the lessor can reasonably and adequately be compensated for his injury, courts in equity will generally grant relief." *Food Pantry v. Waikiki Business Plaza*, 58 Haw. 606, 614, 575 P.2d 869, 876 (1978).

With respect to the first requirement in *Food Pantry*, Defendants contend that although LSKI's default frustrated 4000 OPRP's ability to conduct an audit, the failure was not intentional. Even if we agree with Defendants, they have not satisfied this requirement. The record supports the district court's finding that LSKI's default was caused by LSKI's gross negligence.

The second requirement in *Food Pantry* is implicated in Defendants' contention that there is no evidence that 4000 OPRP suffered any financial damage as a result of LSKI's default. Defendants suggest that 4000 OPRP could have reconstructed gross sales by taking discovery of LSKI's T-shirt manufacturers and other vendors, taking depositions of LSKI's employees regarding sales, and comparing pre- and post-audit sales figures. We agree that the record does not establish whether it was possible for

LSKI to remedy or cure its material default by introducing objective evidence reasonably and adequately corroborating its accurate reporting of all gross sales. The question is whether 4000 OPRP or Defendants had the burden on this issue. The answer is the Defendants. As noted earlier, 4000 OPRP had the burden of proving LSKI's material default. It did so and, pursuant to the provisions of the Lease, was authorized to terminate the Lease for that reason. Defendants' sought equitable relief from 4000 OPRP's right to terminate the Lease. Since it was Defendants who alleged and would have benefitted by proof that 4000 OPRP suffered no damage or that all damages it suffered had been remedied or sufficiently mitigated, it was Defendants' burden to prove that fact. 29 AM. JUR. 2D *Evidence* § 127 (1967). Defendants failed to fulfil their burden. The breaching party suffers the risk that the default is irremediable. The fact that in 1991 LSKI paid the rent deficiency determined by the audit, installed sealed cash registers, and maintained records as required by the lease did not address the problems created by its prior two non–monetary defaults in 1989 and 1990.

### F.

Defendants challenge COL No. 8. They contend that nothing in the lease or otherwise permits 4000 OPRP to recover the costs of a private appraisal obtained solely to benefit 4000 OPRP. We agree.

### CONCLUSION

Accordingly, we affirm the part of the district court's October 24, 1991 judgment that (1) orders a writ of possession to issue in favor of Plaintiff and against Defendants awarding Plaintiff possession of the leased premises; (2) states that Plaintiff is entitled to reasonable attorneys'

fees incurred and costs of suit, which amounts shall be submitted by way of affidavit, and which sums may be included in the judgment; and (3) enters judgment in favor of Defendants and against Plaintiff in the amount of $130.00, plus attorneys' fees of $32.50 pursuant to HRS section 607–14.

We reverse the part of the district court's October 24, 1991 judgment that awards Plaintiff a $4,456.48 judgment against Defendants, which sum includes $4,000.00 as the increased cost of appraisal and $456.48 as the cost of the audit.


*Edward A. Jaffe* (with him on the briefs *David Waters, Shana K. Chung, Stephanie A. Chin*; Torkildson, Katz, Jossem, Fonseca, Jaffe, Moore & Hetherington of counsel) for defendants–appellants.

*Susan Jameson* (with her on the brief *Calvin K. Murashige*; Shiraishi Yamada & Murashige of counsel) for plaintiff–appellee.