935 P.2d 992

John R. AICKIN, George C. Meyer, Sr., Colleen R. Meyer, and A & M Corporation, a Hawai'i corporation, Plaintiffs–Appellants,

v.

OCEAN VIEW INVESTMENTS COMPANY, INC., a Hawai'i corporation, Defendant–Appellee,

and

John R. AICKIN, George C. Meyer, Sr., Colleen R. Meyer, and A & M Corporation, a Hawai'i corporation, Third Party Plaintiffs,

v.

John DOES 1–10, Third Party Defendants.

No. 18163.

Supreme Court of Hawai'i.

March 11, 1997.

As Amended April 18, 1997.

Jack C. Morse, on the briefs, Honolulu, for Plaintiffs-Appellants.

Stephen D. Whittaker and David W. Lacy of Case & Lynch, on the briefs, Kailua-Kona, for Defendant-Appellee.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

RAMIL, Justice.

Plaintiffs–Appellants John R. Aickin, George C. Meyer, Sr., Colleen R. Meyer, and A & M Corporation (collectively Lessees) appeal from (1) the order denying their motion for summary judgment and (2) the findings of fact (FOFs), conclusions of law (COLs), and final judgment entered in the Third Circuit Court. On appeal, Lessees contend the trial court erred when it: (1) denied Lessees' motion for summary judgment;[1] (2) admitted certain items into evidence;[2] (3) entered certain FOFs and COLs; (4) entered its final judgment, in which the court terminated the commercial lease, failed to require Defendant–Appellee Lessor to compensate Lessees for the "windfall" received by Lessor, and awarded attorney's fees and costs to Lessor; and (5) ruled that the lease would not continue for the five-year period commencing April 1, 1993. Lessees, however, devote the bulk of their brief to addressing the principle of equity and the importance of its application in the present case. In other words, Lessees argue that had the trial court properly applied equitable principles, it would not have erred as alleged, *supra*. Because we believe that equity should intervene in this case, and because we hold that Lessees were not in material de-

fault of the lease, we partially reverse those portions of the final judgment and the order granting fees and costs to Lessor.

## I. *BACKGROUND*

In the 1970s, Lessor (hereinafter sometimes referred to as OVI) purchased forty-eight acres of undeveloped land in the Hawaiian Ocean View Rancho Subdivision, located on the island of Hawai'i. Lessor paid $14,000 for lot 4, which consisted of three acres.

Prior to 1983, Lessor had obtained a special use permit from the County of Hawai'i to allow development of its acreage in return for a commitment to provide a gasoline service station in this remote area. After unsuccessful negotiations with other individuals, Lessor received from Lessees an offer, dated January 7, 1983, to lease one acre of lot 4 (hereinafter "the premises") and to construct "an automobile fuel service and maintenance station and a building for retail sales." Thereafter, on March 1, 1983, Lessees and Lessor agreed that the lease term was to be ten years, commencing on April 1, 1983, and terminating at midnight on March 31, 1993. Lessees were required to expend $50,000 on improvements to the premises.[3] The lease

---

**1.** Lessees claim that because there were no genuine issues of material fact and Lessor conceded that Lessees' failure to extend the option was a mistake, they were entitled to judgment as a matter of law and, therefore, that the trial court improperly denied their motion for summary judgment. We disagree. Equity is a *discretionary* remedy; the trial court was not obligated to grant it. Accordingly, we affirm the trial court's denial of Lessees' motion for summary judgment. *See AIG Hawai'i Insurance Company, Inc., v. Bateman,* 82 Hawai'i 453, 457, 923 P.2d 395, 398 (1996); *see also Heatherly v. Hilton Hawaiian Village Joint Venture,* 78 Hawai'i 351, 353, 893 P.2d 779, 781, *as amended on partial grant of reconsideration,* 78 Hawai'i 474, 896 P.2d 930 (1995).

**2.** No argument in support of this claim appears in the "Argument" section of Lessees' opening brief. Accordingly, we exercise our prerogative "to disregard it without reaching the issue presented." *State v. Jackson,* 81 Hawai'i 39, 46, 912 P.2d 71, 78 (1996).

**3.** Section 8.1 of the lease agreement states in relevant part:
 *Construction.* Lessee, at its own expense, shall complete the construction of an automo-

bile fuel service and maintenance station and a building for retail sales which shall have a combined cost of not less than FIFTY THOUSAND AND NO/100 DOLLARS ($50,000.00). Plans for these improvements shall be submitted to the Planning Department within sixty (60) days of the date hereof and Final Plan approval be obtained as soon thereafter as possible but in no event later than July 1, 1983. Lessee shall commence construction within thirty (30) days of the date of receipt of final plan approval and shall complete construction within four (4) months thereafter.

Having spent $133,760 on the initial construction of the automobile fuel service and maintenance station, Lessees complied with this section of the agreement. In addition, Lessees spent $201,558 during the first ten years of the lease for subsequent building improvements, administrative costs, and interest on the Bank of Hawai'i mortgage obtained to finance the project. Lessees' mortgage was refinanced and installment payments were made by Lessees from the subtenant income received from the leased premises. The remaining principal amount due on the mortgage at the time of trial was $112,000.

also provided that Lessees, only if "not then in material default," had the option of extending the term of the lease for eight additional five-year terms by giving Lessor notice, in writing, not less than six months prior to the end of the first term, and not less than six months prior to the end of each succeeding extended five-year term.[4] Although Lessees were required to notify Lessor in writing of their intention to extend the lease on or before September 30, 1992, they failed to do so.

Almost four months later, by letter dated January 26, 1993, Lessor notified Lessees that, pursuant to the lease agreement,[5] they were to "surrender the premises in a clean and orderly condition to the Lessor's satisfaction." In the same letter, Lessor inquired whether Lessees had registered underground storage tanks as required by law. Lessees' attorney, Daniel Lee, sought to extend the lease on February 3, 1993.[6] Nevertheless, on February 5, 1993, Lessor declined to do so, claiming that the option had expired and that Lessor was prepared to take over the premises on April 1, 1993.[7] On March 3, 1993, Lessees filed a complaint in the Third Circuit Court against Lessor, alleging, *inter*

*alia*, that: (1) Lessor would be unjustly enriched at the expense of Lessees' permanent improvements on the land and the income revenue being generated by these improvements; (2) Lessor's enrichment would result from its knowingly permitting Lessees innocently to violate the requisite time period for giving written notice to extend the lease; and (3) Lessor's intentions to benefit from Lessees' mistake had already been made known to Lessees' sublessees. Based on these allegations, Lessees prayed for the following relief:

> 1. [A declaration] [t]hat [Lessor] by its conduct is not entitled to terminate the Lease due to [Lessee]s' substantial mistake in providing notice.

> 2. [That] [u]pon a prompt hearing, [Lessor] be restrained and enjoined from terminating the Lease, taking any action against [Lessees] or its subtenants, from making any and all claims with respect to terminating the Lease and assuming the position of landlord over tenants in the building as set forth in the proposed form of Preliminary Injunction attached hereto as Exhibit C.

---

4. Section 3 of the lease agreement provides in relevant part:
> If the Lessee is not then in material default hereunder, Lessee may extend the term of this Lease for eight (8) additional five-year terms by giving Lessor notice in writing not less than six (6) months prior to the end of the first term hereof and again not less than six months prior to the end of each preceding [sic] extended five-year term.

5. Section 16 of the lease agreement provides in relevant part:
> At the end of the term or other sooner termination of this Lease, the Lessee will peaceably deliver up to the Lessor possession of the land hereby demised, together with all buildings and other improvements (including fuel pumps, tanks and the connecting plumbing and controlling devices) upon or belonging to the same, by whomsoever made, in good repair, order and condition except as otherwise expressly provided herein; provided, however, that if not then in default hereunder, the Lessee may, or if the Lessor shall require by notice thereof given not less than sixty (60) days prior to the end of the term hereof the Lessee shall remove all trade fixtures placed upon the demised premises, and the Lessee shall replace and repair all damage to the premises and leave the premises in a clear and orderly con-

dition to the Lessor's satisfaction. If the Lessee shall fail to remove all of its goods and trade fixtures within ten (10) days after the end of the term or sooner determination of this Lease, such goods and trade fixtures may at the Lessor's sole option be deemed conclusively to have been abandoned by the Lessee. If Lessee fails to surrender the premises at the expiration or sooner termination of this Lease, Lessee shall defend and indemnify Lessor from all liability and expense resulting from the delay or failure to surrender, including, without limitation, claims made by any succeeding tenant founded on or resulting from Lessee's failure to surrender.

6. Lessees assert that Mr. Lee's letter was not a response to Lessor's communication because Lessors sent the letter to an old address.

7. Subsequently, on February 9, 1993, Lessees notified Lessor that they had assigned their interest in the lease to A & M on February 8, 1993, and requested that Lessor provide them with a form for consent for the assignment of lease to A & M. By letter dated February 18, 1993, Lessor requested more information regarding A & M to determine "whether the giving of our consent is reasonable." Lessees and A & M failed to respond to Lessor's request.

3. That the Court determine that said Lease is in effect or in the alternative that [Lessor] should reimburse [Lessees] for the cost of all improvements made on said property.[8]

On December 27, 1993, Lessees filed a motion for summary judgment requesting that the lease remain in effect for the five-year period commencing April 1, 1993. The circuit court denied Lessees' motion on January 11, 1994.

At the conclusion of a bench trial, the circuit court entered the following pertinent FOFs, COLs, and order:[9]

### FINDINGS OF FACT

14. The lease agreement provided, in § 15, that the "Lessee will not without the written consent of Lessor, except as herein expressly provided, assign or mortgage this Lease nor sublet or part with possession of the whole or any part of the demised premises."

15. Lessees were in breach of the lease agreement on September 30, 1992 and March 31, 1993 because they failed to seek written consent from [OVI] for any of a number of subleases of the premises.

* * *

17. Lessees were in breach of the lease agreement on September 30, 1992 and March 31, 1993 because they were consistently late with their minimum rent and percentage rent payments.

* * *

19. Lessees were in breach of the lease agreement on September 30, 1992 and March 31, 1993 because they failed to timely notify, in violation of HRS § 342L–30, the State of [Hawai'i] Department of Health of the existence of an underground storage tank on the premises.

20. The lease agreement provided, in § 13, that the "Lessee will not commit or suffer any act or neglect whereby said premises or any improvement thereon or the estate of Lessee therein shall at any time during said term become subject to any attachment, judgment, lien, charge or encumbrance whatsoever."

21. Lessees were in breach of the lease agreement on September 30, 1992 and March 31, 1993 because they allowed liens to attach to the premises.

* * *

34. The proceeds from [a $150,000 loan] went in part to pay the Lessees back all of the money they had invested in the premises through June, 1984. Approximately $20,00[0] of the loan proceeds is [sic] unaccounted for.

* * *

38. A & M CORPORATION received economic benefits in an amount not less than $132,555 from the inception of the lease agreement through 1992 as follows:

(1) Operating loss carry forward of over $56,192.

(2) Stockholder loans of over $11,593.

(3) Receipt of excess proceeds from loans to A & M in excess of $20,344.

---

8. On March 3, 1993, Lessees filed a motion for a preliminary injunction which was based upon the complaint. On March 23, 1993, Lessor filed a counterclaim asserting, *inter alia*, Lessees' anticipatory breach of contract and breach of contract, and requesting the termination of the lease, possession of the premises, and damages in an amount to be shown by reason of Lessees' breaches and anticipatory breach of the lease.

On April 26, 1993, the circuit court denied the motion for preliminary injunction based on its findings of fact and the following conclusions of law:

1. The Lease entered by and between the Lessees and [Lessor] dated March 1, 1983 is valid and enforceable according to its terms.

2. [Lessees] failed to timely exercise their option to extend the Lease[;] thus, the Lease entered into by and between the Lessees and [Lessor] terminated at midnight on March 31, 1993.

3. [Lessees] assigned the Lease, without [Lessor]'s written consent, to Plaintiff A & M Corporation.

[4]. The balance of irreparable damage does not favor issuance of an interlocutory injunction in this case.

[5]. To the extent the public interest is involved, it does not suggest granting an injunction in this case.

9. Lessees list a number of FOFs and COLs with which they disagree. Nevertheless, we list only those pertinent to the resolution of this dispute.

(4) Available tax write-off in excess of $44,426 of remaining capital improvements not fully depreciated.

39. The Lessees' investment in the premises is fully leveraged[;] thus they have no money of their own invested in the capital improvements of A & M CORPORATION.

\* \* \*

41. Tax benefits are available to the Lessees because of the net operating losses that A & M CORPORATION has carried forward over the term of the lease agreement.

\* \* \*

### CONCLUSIONS OF LAW

\* \* \*

B. Plaintiffs failed to timely exercise their option to extend the lease agreement[;] thus the lease agreement entered into by and between the Lessees and [OVI] terminated at midnight on March 31, 1993.

C. The Plaintiffs' breaches of the lease agreement, failure to pay minimum and percentage rent, failure to seek written consent from [OVI] for any subleases of the premises, failure to timely notify, in violation of HRS § 342L–30, the State of [Hawai'i] Department of Health of the existence of an underground storage tank on the premises, and failure to prevent liens from attaching to the premises, were individually and collectively material breaches of the lease agreement.

D. Even if the Plaintiffs had timely exercised their option to extend the lease agreement, they were, on September 30, 1992 and March 31, 1993, in material breach of the lease agreement[;] thus the Plaintiffs had no right to exercise their option to extend the lease agreement in any event.

E. The Plaintiffs will suffer no forfeiture if the lease agreement is enforced according to its terms. *See Urban Research Studies & Development, Ltd. v. Teruya & Sons,* 3 Haw.App. 5, 639 P.2d 1115 (1982).

F. The Plaintiffs are entitled to no equitable relief if the lease agreement is enforced according to its terms. *Id.*

\* \* \*

G. The Plaintiffs' filing of a Complaint and Motion for Preliminary Injunction in an attempt to prevent the expiration of the lease agreement constituted an anticipatory repudiation of the lease agreement.

\* \* \*

K. [OVI], as the prevailing party, is entitled to its reasonable costs and attorney's fees incurred herein.

### ORDER

1. That [Lessor] is entitled to immediate possession of the premises;

2. That [Lessees] shall surrender the premises to [Lessor] in good repair, order and condition as contemplated by the lease agreement.

3. That [Lessor] is entitled to indemnification by [Lessees] from any actions, suits, damages and/or claims resulting from [Lessees'] failure to notify the Department of Health of the State of Hawai[']i that there is an underground storage tank on the premises.

4. That [Lessor] is further entitled to indemnification by [Lessees] from any actions, suits, damages and/or claims resulting from [Lessees'] failure to surrender the premises in good repair, order and condition and/or [Lessees'] failure to observe and perform all laws, including, but not limited to, indemnification from any actions, suits, damages and/or claims resulting from contamination of the premises by the underground gasoline storage tank; and

5. That [Lessor] is entitled to its reasonable attorney's fees and costs incurred herein.

(Some brackets in original and some added.)

Thereafter, on June 15, 1994, Lessor filed a motion for award of attorneys' fees and costs and for entry of final judgment. Granting Lessor's request, the circuit court entered a final judgment on September 26, 1994 which provided, *inter alia*, that Lessor recover from Lessees attorney's fees and

costs totaling $61,351.04. This timely appeal followed.

## II. *STANDARDS OF REVIEW*

"The relief granted by a court [in] equity is discretionary and will not be overturned on review unless the [circuit] court abused its discretion by issuing a decision that clearly exceeds the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of the appellant." *AIG Hawai'i Insurance Company, Inc., v. Bateman*, 82 Hawai'i 453, 457, 923 P.2d 395, 398 (1996) (citations and internal quotation marks omitted).

■ FOFs are reviewed under the clearly erroneous standard. *Dan v. State*, 76 Hawai'i 423, 428, 879 P.2d 528, 533 (1994). "A finding of fact is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been committed." *Id.*

■ We review the trial court's COLs *de novo* under the "right/wrong" standard. *Raines v. State*, 79 Hawai'i 219, 222, 900 P.2d 1286, 1289 (1995). "Under this ... standard, we examine the facts and answer the question without being required to give any weight to the trial court's answer to it." *State v. Miller*, 4 Haw.App. 603, 606, 671 P.2d 1037, 1040 (1983). *See also Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 119, 839 P.2d 10, 28, *reconsideration denied*, 74 Haw. 650, 843 P.2d 144 (1992). Thus, a COL "is not binding upon the appellate court and is freely reviewable for its correctness." *State v. Bowe*, 77 Hawai'i 51, 53, 881 P.2d 538, 540 (1994) (citation omitted).

10. In its COLs, the trial court ruled that Lessees would suffer no forfeiture if the lease was enforced according to its terms and, therefore, that they were not entitled to equitable relief.

11. *See also Fellows v. Martin*, 217 Conn. 57, 584 A.2d 458, 463–64 (1991) (court considers several factors in deciding whether to grant equitable relief); *Gardner v. HKT Realty Corp.*, 23 Ark.App. 148, 744 S.W.2d 735, 738 (1988) ("[T]he deter-

## III. *DISCUSSION*

### A. *Lessees Were Entitled to Equitable Relief*

Lessees contend the circuit court erred when it denied them equitable relief[10] and thereby failed to declare the exercise of their option effective notwithstanding that they had given notice more than four months late. Lessees argue that existing Hawai'i cases indicate that this court should adopt the reasoning in *Car-X Service Systems, Inc. v. Kidd–Heller*, 927 F.2d 511 (10th Cir.1991), and *Fletcher v. Frisbee*, 119 N.H. 555, 404 A.2d 1106 (1979). In contrast, Lessor claims that such cases are exceptions to the long-established general rule that equity will not intervene in a contract issue in the absence of fraud, mistake, or duress.

Lessees rely heavily on the line of cases that begin with *F. B. Fountain Co. v. Stein*, 97 Conn. 619, 118 A. 47 (1922). In *Fountain Co.*, the lessee failed to exercise his option to renew within the thirty days provided in the contract. *Fountain Co.*, 118 A. at 48. The Connecticut Supreme Court held that, because the notice was not timely given, the plaintiff-lessee had "no right to relief unless it can establish ... such facts as will bring it within the power of equity to relieve." *Id.* The court concluded that

in cases of willful or gross negligence in failing to fulfill a condition precedent of a lease, equity will never relieve. But in cases of mere neglect in fulfilling a condition precedent of a lease, which do not fall within accident or mistake, *equity will relieve when the delay has been slight, the loss to the lessor small, and when not to grant relief would result in such hardship to the tenant as to make it unconscionable to enforce literally the condition precedent of the lease.*

*Id.* 118 A. at 50 (emphasis added).[11] The court also noted that a commercial lessee

mination of the court turns not on a single factor but on the balancing of the equities between the parties, i.e., the extent to which the lessor has changed his position or otherwise been damaged, and the extent to which enforcement of the covenant would be an unconscionable hardship on the tenant"); *Linn Corp. v. LaSalle National Bank*, 98 Ill.App.3d 480, 53 Ill.Dec. 885, 888, 424 N.E.2d 676, 679 (1981) (application of equity is

who has made substantial improvements to the premises has an equitable interest in the renewal period in view of the character of the lease and the work lessee has performed under it. *Id.*

Lessees also cite *Car–X Service Systems, supra,* for support. In *Car–X Service Systems,* the issue on appeal was "whether the district court erred in granting equitable relief to a lessee who failed to timely exercise its right to renew a five-year lease of commercial property for an additional five years." *Car–X Service Systems,* 927 F.2d at 511. The lease required the lessee, Car–X, to renew the lease at least six months before the original term expired. Car–X gave its notice of renewal four-and-a-half months late. In ruling that Car–X should not be held to the notice requirement, the trial court reasoned as follows: (1) the current five-year lease term had not yet expired when Car–X gave its notice of intent to renew; (2) the lessor did not contend that she had never received a copy of the notice; (3) to declare the option as lost would do relatively great harm to the lessee, Car–X; and (4) allowing Car–X to remain as lessee for an additional five years would do relatively little harm to the lessor. *Id.* at 515. On appeal, the Tenth Circuit affirmed the district court's ruling, noting further that the case did not involve an intentional or willful failure to timely renew. *Id.* at 516.

Lessor relies on cases such as *Reynolds–Penland Co. v. Hexter & Lobello,* 567 S.W.2d 237 (Tex.Civ.App.1978), in which the court held that mere neglect by the lessee in failing to timely exercise its option, absent other ameliorating circumstances such as fraud, waiver, or misleading statements or acts by the lessor, did not justify the interposition of equity to rewrite the lease, even though hardship to the lessee may have resulted. *Id.* at 239. The *Reynolds–Penland* court expressly rejected the *Fountain Co.* rule, stating that, if it were accepted, "all contracts would be called into question as meaningless and uncertain, dependent upon the whims of a panacean court or a jury." *Id.* at 241. However, *Reynolds–Penland* has been criticized in Texas and other jurisdictions:

> The rule in *Reynolds–Penland* is of questionable authority and validity, because a subsequent Texas Court of Appeals case expressly abandoned the majority holding in *Reynolds–Penland.* In the view of that court, *Reynolds–Penland* could not stand in the face of a prior Texas Supreme Court case, *Jones, Administrator v. Gibbs,* 133 Tex. 627, 130 S.W.2d 265 (1939), which appeared to follow the rule established in *Fountain.* See *Inn of Hills, Ltd. v. Schulgen & Kaiser,* 723 S.W.2d 299, 301 (Tex. App.1987).

*Fleming Companies v. Equitable Life Ins. Co. of Iowa,* 16 Kan.App.2d 77, 818 P.2d 813, 820 (1991).[12] *See also McClellan v. Ashley,* 200 Va. 38, 104 S.E.2d 55 (1958) (rejecting *Fountain* as being too broad).

Hawai'i courts have not specifically addressed the application of equitable principles to a situation involving untimely renewal of a commercial lease of real property. Nevertheless, a review of Hawai'i cases that address the use of equity in the context of other real property transactions is instructive.

In *Food Pantry v. Waikiki Business Plaza, Inc.,* 58 Haw. 606, 575 P.2d 869 (1978), substantial evidence indicated that the lessee

---

governed by several factors); *Ward v. Washington Distributors, Inc.,* 67 Ohio App.2d 49, 425 N.E.2d 420, 423–24 (1980) (equity may intervene where failure to give notice was an "honest mistake" and tenant has made valuable improvements to the property); *Fletcher v. Frisbee,* 119 N.H. 555, 404 A.2d 1106, 1108–09 (1979) (court considers length of delay in exercising option, prejudice to landlord, and hardship to tenant in deciding whether to grant equitable relief).

12. Other cases adopting the rule in *Reynolds–Penland* are still good law and are cited by Lessor. *See, e.g., Western Tire, Inc. v. Skrede,* 307 N.W.2d 558 (N.D.1981) (lessee who failed to meet the requirements of the lease both as to the manner and the time period required for exercise of the option to renew was not entitled to equitable relief from forfeiture of the lease where (1) failure to grant relief did not render the liberal enforcement of the renewal provision unconscionable and (2) the landlord was prejudiced by having to accept inadequate rentals in comparison to what similar properties in the vicinity commanded). *But see Fletcher, supra* (holding that the fact that a landlord could have leased property more advantageously is not always sufficient to defeat a lessee's claim for equitable relief).

had materially breached his non-assignment covenant; therefore, under the strict terms of the lease, the lessor was entitled to terminate the lease. *Id.* at 613, 575 P.2d at 875. The trial court declined to permit the lessor to discontinue the lease, explaining that "[t]he [c]ourt, sitting in equity, has the power to mold a decree that would grant appropriate relief to [the lessor] without creating an extreme hardship to lessee, despite the [lessee]'s breaches." *Id.*

On appeal, this court, holding that the trial court had not abused its discretion in refusing to allow the lessor to terminate the lease, stated that:

> [w]here the lessee's breach has not been due to gross negligence, or to persistent and wilful conduct on his [or her] part, and the lessor can reasonably and adequately be compensated for his [or her] injury, courts in equity will generally grant relief. This matter is addressed to the sound discretion of the trial court acting in accordance with established principles of equity, and its determinations will not be set aside unless manifestly against the clear weight of the evidence. See First Hawaiian Bank v. Smith, 52 Haw. 591, 483 P.2d 185 (1971). And in exercising its equity powers to relief from forfeiture, the trial court is empowered to fashion a decree to meet the requirements of the situation and to conserve the equities of the parties. Fleming v. Napili Kai, Ltd., 50 Haw. 66, 430 P.2d 316 (1967), reh'g denied, 50 Haw. 83, 431 P.2d 299 (1967).

*Id.* at 614, 575 P.2d at 876 (emphasis added).

■ Other Hawai'i decisions reveal that only willful, intentional, indifferent, or grossly negligent conduct bars equitable relief—mere negligence does not. *See Jenkins v. Wise,* 58 Haw. 592, 574 P.2d 1337 (1978) (courts will usually grant equitable relief if breach was not due to gross negligence); *Pollick v. Pollick,* 52 Haw. 357, 477 P.2d 620 (1970) (holding that equity seeks to ensure that intentions are not defeated by mere oversight); *Scotella v. Osgood,* 4 Haw.App. 20, 659 P.2d 73 (1983) (in the context of a land purchase contract, equity is not barred unless vendee's breach is due to gross negligence or deliberate bad faith); *Ventura v. Grace,* 3 Haw.App. 371, 650 P.2d 620 (1982) (equity will not permit a forfeiture of land if vendee's breach is not due to gross negligence or bad faith); *Gomez v. Pagaduan,* 1 Haw.App. 70, 613 P.2d 658 (1980) (courts in equity will generally grant relief in the absence of gross negligence or bad faith). Thus, in light of Hawaii's case law and that of other jurisdictions, the issue becomes whether the trial court abused its discretion in refusing to exercise its equitable powers to allow Lessees to prevail even though they caused the harm about which they complain. We hold that it did.

■ Under *Fountain Co., Car–X Service Systems,* and the Hawai'i property cases cited *supra,* in order to demonstrate that they are entitled to equitable relief, Lessees would bear the burden of showing that: (1) their conduct was not intentional, willful, or grossly negligent; (2) Lessor did not rely to its detriment on Lessees' failure to give notice; (3) strict enforcement of the notice provision would result in unconscionable hardship to Lessees; and (4) within the context of the lease itself, the delay in giving notice was not unreasonably long. We now adopt the foregoing standard and hold that Lessees have met their burden.

Lessees' original ten-year lease term had not yet expired when they tendered written notice to OVI of their intent to renew on February 3, 1993. *See, e.g., Car–X Service Systems, supra.* Lessor does not dispute receiving this notice, and Lessor's letter of February 5, 1993 acknowledges its receipt. We do not believe a four-month delay, within the context of a ten-year lease of potentially fifty years' total duration, was unreasonably long. Nor does the record suggest that Lessees' actions were intentional, willful, or even grossly negligent. In fact, Lessor stipulated at trial that Lessees' failure to exercise the option was an oversight.[13]

---

**13.** At trial on February 22, 1994, Lessor stipulated to this mistake:

THE COURT: So, the stipulation is that the plaintiffs' failure to give written notice by September 30, 1992 was a mistake and not intentional.

MR. MORSE [FOR THE PLAINTIFF]: That's correct.

■ FOFs 34, 38, and 39 appear to reflect the trial court's belief that Lessees would suffer no forfeiture if the lease were not extended. To the contrary, to declare the option forfeit would do relatively great harm to Lessees. First, and most significantly, Lessees made substantial improvements totaling approximately $142,038 to the premises.[14] Second, the record indicates that the figures cited in FOFs 38 and 41 were based on "speculation," and Lessor's expert admitted that he was not sure if the $56,192 carry forward or the capital depreciation of $44,426 could ever be used. Third, Lessees' investment is "fully leveraged," and they remain liable for repayment of all loans and mortgages. Under these circumstances, we are convinced that loss of the lease renewal options would be an unconscionable forfeiture. Accordingly, the trial court's FOFs 34, 38, 39, and 41 are clearly erroneous and COL E is wrong as a matter of law.

On the other hand, allowing Lessees to extend the lease for a five-year period would do little harm to Lessor. Lessor's argument that Lessees' delay obliged it to "conduct[ ] meetings" and "wr[i]te letters" concerning Lessees' failure to exercise their option hardly rises to the level of cognizable "prejudice."

■ The test to determine whether Lessor was injured by the delay is whether he changed his position or suffered a detriment because of Lessees' delay in giving notice of renewal. See Car–X Service Systems, 927 F.2d at 517; Gardner v. HKT Realty, 23 Ark.App. 148, 744 S.W.2d 735 (1988); Duncan v. G.E.W., Inc., 526 A.2d 1358, 1365

(D.C.1987); Fletcher v. Frisbee, 404 A.2d at 1108. For example, in Gardner, the Arkansas court of appeals held that a tenant who had failed to exercise his option to renew by a certain date was entitled to equitable relief, in part because the landlord had not changed his position as a result of the breach.[15] Id. 744 S.W.2d at 738.

We do not believe, under the facts of this case, that holding meetings and writing letters constitute a change in position on the part of Lessor such that equitable relief is barred. There is no evidence on record that Lessor either actively attempted to market the property or that Lessor had fielded any offers, between September 1992 and February 1993, from third parties to buy or lease the premises. In fact, it appears that Lessor became aware of Lessees' failure to renew the lease only in late December 1992, nearly three months after the September 30 renewal deadline.

■ For the foregoing reasons, we hold that the trial court abused its discretion in refusing to apply equitable principles to the case at bar. To hold that equity should not intervene to allow Lessees to exercise the option after it had expired due to a mistake, absent other factors, would be

a regression to the days when hypertechnical legal arguments were relied upon to prevent fair and just results. *We believe a more worthy result is one that fulfills the commercial expectations of the parties and avoids unconscionable hardship.* The real estate community, however, may rest as-

---

THE COURT: Mr. Whittaker?
MR. WHITTAKER [DEFENSE]: Your honor, we accept that stipulation....

**14.** The evidence shows that Lessees paid the following amounts to construct and maintain the improvements on the leasehold premises:

| | |
|---|---|
| Building construction | $118,495 |
| Installation of underground gas tanks | 13,421 |
| Machinery and fixtures | 1,844 |
| Repainting the building in 1992 | 814 |
| Repaving the parking lot in 1992 | 6,169 |
| Creating second entrance to premises | 1,295 |
| TOTAL | $142,038 |

Moreover, Lessees testified they had every intention of extending the lease and that Lessor had notice of this, as evinced by substantial improve-

ments Lessees made to the premises, including painting and repaving in 1992. Lessor presented no evidence to the contrary.

**15.** Specifically, the Gardner court held that

[t]here was no evidence that [Lessor] had changed [its] position in any way because of the failure to give notice of renewal or that any harm would result to [Lessor] if the lease was continued. There was evidence that the appellees had never intended for the lease to lapse, and had in fact expended large sums in obtaining architectural plans for costly improvements to the property which would make it more profitable during the latter years of the extended terms of the lease.
Gardner, 744 S.W.2d at 738.

sured that lease options remain enforceable, and that as a general rule they will be strictly enforced according to their terms. *We emphasize that equitable relief from the strict terms of a renewal or purchase option is the rare exception to this rule.*

*Duncan v. G.E.W., Inc.,* 526 A.2d at 1365 (emphases added).

### B. *Lessees Were Not in Material Default Under the Lease Agreement.*

In the alternative, Lessors argue that even if this court were to apply equitable principles, we still should not allow Lessees to exercise the option because they were in "material default" under the lease.[16]

Leases are essentially contractual in nature and are reviewed under principles of contract law. *Cho Mark Oriental Food v. K & K Int'l,* 73 Haw. 509, 519, 836 P.2d 1057, 1063 (1992); *Maui Land & Pineapple Co. v. Dillingham Corp.,* 67 Haw. 4, 10, 674 P.2d 390, 394 (1984) (leases should be analyzed under principles of contract law); *Lau v. Bautista,* 61 Haw. 144, 149, 598 P.2d 161 Haw. P.2d 161, 165 (1975) ("a lease is essentially a contractual relationship"); *Lemle v. Breeden,* 51 Haw. 426, 433, 462 P.2d 470, 475 (1969) (a lease is "more importantly[ ] a contractual relationship"). "Absent an ambiguity, contract terms should be interpreted according to their plain, ordinary, and accepted sense in common speech." *Cho Mark,* 73 Haw. at 520, 836 P.2d at 1064. Moreover, the "construction and the legal effect to be given a contract is a question of law freely reviewable by an appellate court." *Id.* at 519, 836 P.2d at 1063.

*Hi Kai Inv., Ltd., et al v. Aloha Futons Beds & Waterbeds, Inc.,* 84 Hawai'i 75, 78, 929 P.2d 88, 91 (1996). Section 3 of the lease provides that the option to extend is valid only if Lessee is not then in *material* default. *See supra* note 3. Section 17 of the lease specifically defines a "default"—not a "material default"—in the context of the lease at issue:

### DEFAULT

This demise is made upon the express condition that if the Lessee shall fail to pay said rent or any part thereof within thirty (30) days after the same becomes due, whether the same shall or shall not have been legally demanded, or shall fail faithfully to observe or perform any of the other covenants herein contained and on the part of Lessee to be observed and performed and such default shall continue for thirty (30) days after written notice thereof given to Lessee[;] provided, further, that with respect only to defaults in such other covenants herein contained which are capable of being cured but are not cured within thirty (30) days after notice, Lessee shall not be in default of this Lease if Lessee commences to cure the default within the thirty (30) day period and continues diligently, constantly and in good faith to cure the default.... Lessor may in such case ... at its option terminate this Lease upon the delivery of written notice or legal process ... and may bring an action for summary possession of said premises, all without prejudice to any other remedy or right of action which Lessor may have for arrears of rent or for any preceding or other breach of contract.

Based upon this definition of default, Lessor contends that the trial court correctly concluded that the following were individually and collectively material defaults: (1) "failure to timely pay minimum and percentage rent[;]" (2) "failure to seek written consent from [Lessor] for any subleases of the premises[;]" (3) "failure to prevent liens from attaching to the premises[;]" and (4) "failure to timely notify, in violation of HRS § 342L–30, the State of [Hawai'i] Department of Health of the existence of an underground storage

---

16. The parties use the terms "default" and "breach" rather confusingly in the briefs; both parties attempt mightily, but fail, to distinguish one from the other. For the purpose of this opinion, we use the words interchangeably. Black's Law Dictionary defines the pertinent terms as follows:

> **Breach of contract.** Failure, without legal excuse to perform any promise which forms the whole or part of a contract.
>
> **Default....** Specifically, the omission or failure to perform a legal or contractual duty....
>
> *Black's Law Dictionary* 188, 417 (6th ed.1990).

tank on the premises[.]" Lessees do not dispute that these breaches occurred; they do, however, contend that these were not *material* defaults. We resolve Lessor's first three arguments by studying the language of the lease itself, while the matter of the underground storage tank requires delving deeper into the concept of a "material" breach.

### 1. *Failure to Pay Minimum and Percentage Rent in a Timely Manner*

■■ Lessor asserts that Lessees were in material default of § 4.1[17] of the lease when they failed to pay minimum and percentage rent, in a timely manner, as follows:

1. The rent for January 1992 was paid on January 15, 1992. Minimum rent was therefore fifteen days late.

2. The rent for April 1992 was paid on April 9, 1992. Minimum rent was therefore nine days late.

3. The rent for May 1992 was paid on May 8, 1992. Minimum rent was therefore eight days late.

4. The rent for June 1992 was paid on June 18, 1992. Minimum rent was therefore eighteen days late, and percentage rent was three days late.

5. The rent for July 1992 was paid on July 12, 1992. Minimum rent was therefore twelve days late.

Despite Lessees' delays in making their rent payments in 1992, we do not believe, based upon our interpretation of the lease agreement, that the delays, as noted above, constituted a default as defined in the lease agreement.[18] The default section of the lease agreement states that "[t]his demise is made upon the express condition that . . . the Lessee . . . *fail to pay said rent or any part thereof within thirty (30) days after the same becomes due* [.]" (Emphasis added.) Because default is limited to the failure to pay rent within thirty days, we hold that the trial court erred in ruling that the delays between January 1992 and July 1992, which never exceeded eighteen days, constituted a material default under the lease agreement. Accordingly, FOF 17 is clearly erroneous and COL D is "wrong."

### 2. *Failure to Seek Written Consent from Lessor for Subleases*

■■ Lessor next contends that Lessees were in material default when they breached § 15[19] of the lease because they failed to seek written consent from Lessor for the following subleases:

1. Lease between [Lessees] and Quentin and Marguerite Arbo dated September 2, 1983.

2. Lease between [Lessees] and Rudy and Mona Bryant dated October 4, 1983.

3. Lease between [Lessees] and Robert Self dated September 11, 1985.

4. Lease between [Lessees] and Donald Nitsche dated December 15, 1990.

5. Lease between [Lessees] and South Coast Realty dated March 1, 1991.

6. Promissory Note and Mortgage, Security Agreement, and Financing Statement between [Lessees] and Bank of Hawai'i dated September 29, 1987.

Notwithstanding Lessees' violation of § 15 of the lease, we hold that the failure to seek written consent from Lessor on the six occasions between 1983 and 1991 did not constitute a *material* default under the lease agreement because Lessor: (1) first and

---

**17.** Section 4.1 of the lease agreement provides in relevant part:

> *Minimum Rent.* Lessee shall pay to Lessor at Lessor's place of business without notice, demand or set-off payable in advance on the first day of each month, during the initial term of this Lease, minimum rent[.]

**18.** Nor do we believe that five overdue rent payments over the course of a ten-year lease rise to the level of "consistent" tardiness in paying rent.

**19.** Section 15 of the lease agreement provides in relevant part:

> *ASSIGNMENT AND SUBLETTING*
> Lessee will not without the written consent of Lessor, except as herein expressly provided, assign or mortgage this Lease nor sublet or part with possession of the whole or any part of the demised premises; provided, however, that Lessor agrees not to unreasonably withhold its consent to assignments, subleases, or mortgages which are uses permitted under this Lease.

foremost, never provided Lessees with a thirty-day notice of default as required by § 17 of the lease;[20] (2) never objected to the subtenancies until after the September 30, 1992 deadline to exercise the option to extend the lease; and (3) had knowledge that Lessees had sublet portions of the premises to various sublessees between 1983 and 1991.[21] *See, e.g., Entrepreneur, Ltd. v. Yasuna,* 498 A.2d 1151 (D.C.1985) (landlord estopped from claiming forfeiture of lease based on breach of covenant when tenant acted in good faith, and landlord had knowledge of the breach for two years, yet failed to inform the tenant). Accordingly, we hold that the trial court erred, in COL D, when it held that Lessees' failure to seek written consent from Lessor for the subleases and mortgage constituted a material default under the lease agreement.

### 3. Failure to Prevent Liens from Attaching to the Premises

■■■ Lessor claims that Lessees were in material default when they allowed state tax liens to attach to the premises,[22] thereby breaching § 13[23] of the lease. Section 3 of the lease agreement states that "[i]f the Lessee is not *then* in material default hereunder, Lessee may extend the term of this lease[.]" (Emphasis added.) Although Lessees failed to prevent state tax liens from attaching to the premises on two occasions, because both tax liens were paid, released, and discharged by 1988, Lessees were not in default on September 30, 1992 and March 31, 1993. Accordingly, we hold that (1) the trial court erred in ruling that Lessees' failure to prevent state tax liens from attaching to the premises constituted a material default under the lease, (2) FOF 21 is clearly erroneous, and (3) COL D is "wrong."

### 4. Failure to Timely Notify the State of Hawai'i of the Existence of an Underground Storage Tank on the Premises

■■■ Finally, Lessor contends that Lessees breached § 7.2[24] of the lease agreement

20. We interpret § 17 of the lease agreement to require Lessor to provide written notice to Lessees of their default. Section 17 of the lease agreement provides in relevant part:

> This demise is made upon the express condition that if the Lessee ... shall *fail faithfully to observe or perform any of the other covenants herein contained and on the part of Lessee to be observed and performed and such default shall continue for thirty (30) days after written notice thereof given to Lessee, ... Lessee shall not be in default of this Lease if Lessee commences to cure the default within the thirty (30) day period*
> ....

(Emphasis added.)

21. We note that Lessor benefited from the subleases via percentage rent, yet never voiced a complaint prior to this action. On appeal, Lessor claims that OVI never knew "whether there were subleases, oral leases, licenses, operating agreements or something else." This argument mischaracterizes the trial testimony of Kenneth Asato, president of OVI, who stated that he "never saw any [written leases or subleases]," not that he was unaware of the presence of other businesses on the premises. The record indicates that OVI was fully aware of the presence of other businesses on the premises.

22. The first state tax lien, recorded in the Bureau of Conveyances in 1987, was due to A & M's unpaid employment security taxes of $291.93. The lien was cancelled on May 4, 1987, and the property subject to said lien was released and discharged therefrom.

The second state tax lien, recorded in the Bureau of Conveyances in 1988, was due to John R. Aickin's unpaid state taxes of $1,300.00, plus interest and penalties totalling $210.82. The outstanding balance of $1,510.82 was paid in full on October 13, 1988, and the property subject to said lien was released and discharged therefrom.

23. Section 13 of the lease agreement provides:

> LIENS
> Lessee will not commit or suffer any act or neglect whereby said premises or any improvement thereon or the estate of Lessee therein shall at any time during said term become subject to any attachment, judgment, lien, charge or encumbrance whatsoever, other than any authorized mortgages, and will indemnify and hold Lessor harmless from all loss, cost and expense with respect thereto. Lessee shall have the right to contest the correctness or the validity of any lien that attaches to said premises or any improvements thereon or the estate of the Lessee therein if, immediately on demand of Lessor, Lessee procure [sic] a good and sufficient surety bond against such lien and any cost, liabilities or damages arising out of such contest. The bond shall be in an amount equal to two times the amount of the claim of lien or such lesser sum as is acceptable to Lessor.

24. Section 7.2 of the lease agreement provides:

> *Observance of Laws.* Lessee will at all times during said term keep said premises in a strictly clean, orderly and sanitary condition and

when they failed to timely notify the State of Hawai'i Department of Health (DOH) of the existence of an underground storage tank on the premises, a violation of HRS § 342L–30.[25] At trial, Lessees conceded that they did not register the tanks until 1993.[26] Colleen Meyer attended two environmental law seminars sometime in 1987, 1988, or 1989, during which she "learned about [Hawai'i] laws regarding registration of underground storage tanks." Lessees, however, failed to notify the DOH until May 24, 1993, almost two months after the expiration of the original lease. Thus, the issue before the court is whether this breach constituted a material default such that Lessees would not be entitled to equitable relief.

 A *material* default or breach does not result simply because a party to a contract violates one of the agreement's provisions. In *Golf Carts, Inc. v. Mid–Pacific Country Club*, 53 Haw. 357, 493 P.2d 1338 (1972), this court defined a material breach, albeit in a different context:

> A rescission is not warranted by a mere breach of contract not so substantial and fundamental as to defeat the object of the parties in making the agreement. Before partial failure of performance of one party will give the other the right of rescission,

the act failed to be performed must go to the root of the contract or the failure to perform the contract must be in respect of matters which would render the performance of the remainder a thing different in substance from that which was contracted for.

53 Haw. at 359, 493 P.2d at 1339 (quoting *Yucca Mining & Petroleum Co. v. Howard C. Phillips Oil Co.*, 69 N.M. 281, 285, 365 P.2d 925, 927 (1961) (internal quotation marks omitted)) (emphases added).[27] "In construing a contract, a court's principal objective is to ascertain and effectuate the intention of the parties as manifested by the contract in its entirety. If there is any doubt, the *interpretation which most reasonably reflects the intent of the parties* must be chosen." *University of Hawaii Professional Assembly v. University of Hawaii*, 66 Haw. 214, 219, 659 P.2d 720, 724 (1983) (citations and internal quotation marks omitted) (emphasis added). Annotation, *Material Breach of Lease*, 54 A.L.R.4th 595, 603–04 (1987) provides:

> [A landlord's] right to cancel for breach is not unlimited. One significant limitation ... is based on the common-sense notion that even if the parties gave formal con-

---

observe and perform all laws, ordinances, rules and regulations now or hereafter made by any governmental authority for the time being applicable to said premises or any improvement thereon or use thereof, and will indemnify Lessor against all actions, suits, damages and claims by whomsoever brought or made by reason of the non-observance or nonperformance of said laws, ordinances, rules and regulations o[f] this covenant.

**25.** HRS § 342L–30 (1993) provides in relevant part:

> **Notification requirements.** (a) Except as provided in subsection (c), the owner of an existing underground storage tank or existing tank system shall notify the [DOH] by December 31, 1989, of the existence of the tank or tank system and specify the age, size, type, location, and uses of the tank or tank system. Notice shall be made on an approved form of notice provided by the department.

**26.** Lessees advance—for the first time on appeal—the theory that the statute required Lessor to register the underground tank. "The general rule in this jurisdiction is that we will not ad-

dress a legal theory not raised by the appellant in the court below." *Birmingham v. Fodor's Travel Publications, Inc.*, 73 Haw. 359, 371, 833 P.2d 70, 77 (1992).

**27.** The Restatement (Second) of Contracts § 241 (1979) provides further guidance:

> In determining whether a failure to render or to offer performance is material, the following circumstances are significant:
> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

sent to lease language providing that "any breach" gives rise to a right of termination, the possibility for breach of a modern commercial lease are virtually limitless and undoubtedly the parties did not have in mind minor or technical failures to adhere to lease provisions. Moreover, the potential harshness inherent in abruptly declaring a lease at an end, especially where the party in breach stands to suffer substantial loss from its termination, makes courts reluctant to enforce forfeiture clauses or to allow other involuntary termination of leases, and has resulted in the widely accepted "material breach" rule. Nearly all courts hold that, regardless of the language of the lease, to justify a cancellation, forfeiture, or other premature termination of a lease, the breach must have been "material," "serious," "substantial," or the like....

(Footnote omitted.)

In the instant case, we first look to the contract as a whole to shed light on the intent of the parties in entering into the lease. We then examine the breach itself to determine whether it cut to the "root" of the agreement.

The lease was long-term, with a potential duration of fifty years. Additionally, the contract required Lessees to invest over $50,000 in the construction of the gas station, all of which was to revert to Lessors at the termination of the lease. Thus, on its face, the lease before us indicates that Lessor had two objectives: (1) to bring a "long awaited gas station [and] other badly needed services" to the area, in connection with which Lessor would obtain a special use permit from the county; and (2) to assure a long-term,

monthly income to Lessors. Thus, registration of the underground tank was peripheral to the parties' primary purpose in entering into the lease.

*Linn Corp. v. LaSalle National Bank,* 98 Ill.App.3d 480, 53 Ill.Dec. 885, 424 N.E.2d 676 (1981), involved a similar situation. In holding that the tenants, who had missed the one-year deadline to renew their lease by four months, were entitled to equitable relief, the court looked at the value of improvements made to the premises, which amounted to $200,000. *Id.* 53 Ill.Dec. at 888, 424 N.E.2d at 679. As in this case, the lease required the tenants to make substantial improvements to the property, and the landlords had the right to keep all improvements, without compensating the tenants, at the end of the lease. *Id.* The *Linn Corp.* court affirmed the trial court's construction of the lease to mean that the parties did not intend for the tenants "to make such improvements merely for the right to use the property for only two years and three months." *Id.* The court also found that the facts of the case did not involve an option to renew that was

merely a privilege[,] with no corresponding right or privilege of the lessor. The defendants allegedly received an extremely valuable consideration for granting the options—the right to have the improvements made and the right to keep all such improvements at the conclusion of the lease term or any extension thereof.

*Id.*

▮ Lessees did exert some efforts to register the tank, albeit inept ones.[28] While

(Emphases added.)

**28.** At trial, Colleen Meyer explained the reason for Lessees' failure to comply in a timely manner:

[DEFENSE]: Did you ever register the underground storage tanks?

[MEYER]: After I took the first seminar, I called. It took a couple of calls to find out how to register. I pointed out, it was the [DOH]. And at that time they had an office out in, I think it was Sand Island. And I told the people on the phone that we had a service station on the Big Island called Ocean View Texaco that we had leased to somebody and we had underground tanks.

And they asked for our name and address and that was it. And I assumed something would come to me. It never did. And I just forgot about it.

When I took the next seminar, I don't know what, I don't think I did anything more on the registering. I went down and picked up more documents, more papers on the E.P.A. rules so I could become more familiar with them. I don't know when I registered them. I called the [DOH] again, asked them did they have us registered. They didn't. And I don't think I registered them until after, maybe, not after we began to get into this problem here between [Lessor] and ourselves.

* * *

**462**

their failure to do so in a timely manner constituted a breach of the lease contract, it was not a *material* default or breach such that Lessees would be precluded from equitable relief: The breach simply did not "defeat the object of the parties in making the agreement." *Golf Carts, Inc.*, 53 Haw. at 359, 493 P.2d at 1339. *Cf. Gomez v. Pagaduan*, 1 Haw.App. at 75, 613 P.2d at 661–62 (non-defaulting seller is entitled to "the benefit of the essence of his bargain," but not to a forfeiture, absent the breaching purchaser's bad faith). *But cf. 4000 Old Pali Road Partners v. Lone Star of Kauai, Inc.*, 10 Haw. App. 162, 862 P.2d 282, *cert. granted* 75 Haw. 581, 863 P.2d 989, *appeal dismissed*, 76 Hawai'i 246, 868 P.2d 464 (1993) (a tenant's failure to maintain records and statements of sales, essential to the operation of a percentage lease, constituted a material default). The facts of this case indicate that the parties contemplated a long-term relationship, in which Lessees would provide needed services to the area, in return for the right to conduct business on the premises for an extended period of time. Furthermore, Lessees have testified that Lessor was not damaged or inconvenienced by the delay, and Lessor has adduced no evidence to the contrary. Accordingly, we hold that the circuit court erred in COL D when it held that Lessees' failure to register the underground storage tank was a material default under the terms of the lease.[29] Because Lessor is not the prevailing party, COL K is also wrong as a matter of law.

## IV. CONCLUSION

We affirm the circuit court's order denying plaintiffs' motion for summary judgment. We reverse those portions of the final judgment that award possession of the premises and attorney's fees and costs to the defendant, with the lease to continue for the term commencing April 1, 1993.

[DEFENSE]: Is there any other problem that you know of, that's resulted from filing or registering late?
[MEYER]: No, there was no fine. There was nothing of that kind.

29. Nor do we agree with COL G. Lessors were not attempting to repudiate the lease; rather, they were seeking to have it extended.