In the Matter of the Accounting of GUARANTY TRUST COMPANY OF NEW YORK, as Trustee under the Will of SOLTAN AHMED KADJAR, Deceased.

Surrogate's Court, New York County, December 5, 1950.

*Lee McCanliss* for trustee, petitioner.

*Eugene L. Garey, Ambrose V. McCall* and *Daniel F. Cohalan, Jr.,* for Prince Freydonn Kadjar and others, respondents.

*Ferdinand W. Coudert,* as ancillary administrator of the estate of Queen Malekeh-Djahan, deceased, respondent.

*Alexander Kopp* for K. Karl Klein, respondent.

*Hays, St. John, Abramson & Schulman* for Kurt M. Neu, respondent.

*Francis D. Wells* and *A. Michael Frothingham* for Prince Mahmoud Kadjan and another, respondents.

*Nelson Kantor,* special guardian for unknown assignees, respondent.

*Theodore K. McCarthy,* special guardian for unknown heirs, respondent.

COLLINS, S. The testator reigned as Shah of Persia from the time that his father was deposed, July 16, 1909, until his own Government was overthrown in 1923. He left Persia in that year and never returned. The intervening years up to his death were spent in various European countries. It is conceded that at the time of the execution of his will and at the time of his death, he remained a Persian citizen. He died on February 27, 1930, in France, survived by his mother, Queen Malekeh-Djahan, a son and three daughters.

The testator made a holographic will in the French language, at Paris on October 22, 1928. It was offered for probate here as the will of a resident of Persia who died leaving personal property in this country. It was admitted to probate here in the English translation. The testator gave to his mother certain outright gifts and the income of a certain portion of his securities. The principal of the latter fund was disposed of as follows: "Upon the death of my mother this personal estate and other property will go to her direct heirs or to beneficiaries whom she, by her last Will and Testament shall

elect." The testator's mother died intestate, and the court is now required to determine her "direct heirs" within the meaning of this will.

The Queen Mother died on November 14, 1947, in France. Her husband predeceased her. She was survived by two sons, two daughters, the four children of the testator and five children of another son who predeceased her. The following constructions of the will are urged by the respective parties: (1) the heirs are to be determined under the law of Iran pursuant to which the "direct heirs" are the two sons and two daughters of the life beneficiary, each son taking two sixths and each daughter taking one sixth; (2) the heirs are to be determined under the law of New York under which each of the four living children would take one sixth, the descendants of the testator, one sixth and the descendants of the other deceased son, one sixth; (3) no valid disposition of the property has been made and the fund passes under the residuary clause to the testator's own children.

The property involved in the present litigation is personal property having actual situs here. In applying the rules for construction of a will, confusion sometimes results from a failure to distinguish between a mere interpretation of the text and a pronouncement as to the legal effect of a provision. "Interpretation is an effort to fix in fact the meaning of the words used; the legal effect of the words is the creation of interests and rights by the mere operation of law, without regard to the intention of the words." (2 Beale, on The Conflict of Laws, § 2.51.1, p. 972.) We are here concerned with the interpretation of the terms used by the testator. The general rule is that the meaning of the words used in a will of personal property, in the absence of controlling circumstances to the contrary, is to be determined in accordance with the usage at the domicile of the testator at the time of making the will. (Restatement, Conflict of Laws, § 308; 2 Beale on The Conflict of Laws, § 308.1; 4 Page on Wills, § 1639; *Matter of Good*, 96 N. Y. S. 2d 798, 801; *Matter of Mahkowski*, N. Y. L. J., Nov. 15, 1950, p. 1191, col. 3.) The usage of the terms at the testator's domicile is part of the background against which the will is read. However, the effort in all cases is to find, if possible, the actual meaning which the testator has endeavored to express, and therefore other circumstances may indicate recourse to other usages. Thus, where the will is written in a language not that of the testator's domicile, technical terms are to be interpreted in accordance with the usage of the language used. (Restate-

ment Conflict of Laws, § 308, comment c; *Matter of Garfunkel,* 71 N. Y. S. 2d 693, 695.) On the other hand, where the testator makes it clear that the will is to be interpreted according to the laws of a given jurisdiction other than his domicile, effect will usually be given to such intention (4 Page on Wills, § 1636, p. 695; *Matter of Ryan,* 178 Misc. 1007, 1009, affd. 265 App. Div. 1051; Decedent Estate Law, § 47.) In cases where the real intent of the testator is not evident, the presumed or probable intent must be ascertained from the words used by him, and in the search for the presumed intent respecting the distribution of personalty, the law of the testator's domicile is usually taken as a guide. (*New York Life Ins. & Trust Co.* v. *Viele,* 161 N. Y. 11, 19; *Matter of Battell,* 286 N. Y. 97, 102.)

It is asserted here that in the use of the words " direct heirs " (" héritiers directe ", in the French holograph), the testator was in fact endeavoring to express the equivalent of a technical term used in the law of Iran. The expert on the law of Iran testified that the Persian words, " bela vasitah " literally mean " to or of no intermediary", or in other words, " direct ". Under the law of Iran, a child of the testator takes as heir to the exclusion of descendants of deceased children and grand-children may share only where the decedent has no *" bela vasitah children."* The expert would translate the emphasized words as " direct children ". Hence it is argued that in the vocabulary of the testator the words " direct heirs " mean " bela vasitah children ", which expressly excludes descendants of deceased children.

It appears from expert evidence that the words " héritiers directe " have no settled technical meaning in French law, but that in common usage they are employed to denote a person in the direct line of descent to the exclusion of a collateral heir. (See, also, *Cook* v. *Underwood,* 209 Iowa 641, and 3 Page on Wills, § 1009, p. 118.) Perhaps the testator may have actually attempted to express the equivalent of a Persian technical legal term. The difficulty in translating the term to another language is increased by the fact that the Persian words are expressed in characters. For that very reason, however, had his intent been to express a Persian legal term, we would expect this educated former ruler to have done so more clearly. Other Persian terms are employed in the will. Moreover, wherever he found it necessary to explain his intention or elaborate on the reasons for his dispositions, he did so in his will at great length. Finally, it would not be unreasonable to interpret the

word " direct " as used in counterdistinction to those to whom the mother could appoint. In the original will before the court in the probate proceeding, the text read: "héritiers directe ou aux héritiers qu'elle voudera désigner ". In the opinion of the court, the intention of this testator is not to be predicated solely upon the use of the word " direct " but is to be ascertained from his entire will, read in the light of surrounding circumstances.

A gift to the heirs of a given person is generally determined to pass to those who would constitute that person's heirs according to the law of the domicile of the testator. (*Matter of Battell*, 286 N. Y. 97, 102, *supra*; *Proctor* v. *Clark*, 154 Mass. 45; *Lincoln* v. *Perry*, 149 Mass. 368; *Matter of Fergusson* [1902] 1 Ch. 483; 4 Page on Wills, § 1639, p. 708 and cases cited). The basis of this rule is usually the presumed intent of the testator. It is assumed that he was familiar with his own law and that he probably intended to attach to the words used by him the meaning they have under that law. (See 39 Harv. L. Rev. 277, and 16 Harv. L. Rev. 62.)

The petition in the pending proceeding, like the petition in the probate proceeding, alleges that the testator was a resident of Iran at the time of his death. The respondent grandchildren deny this allegation of domicile and allege that at the time of his death the testator was " domiciled in France or England ". No evidence was offered in support of the allegation of a change of residence. It is conceded that he was in France at the time of his death. Presumably he had lived there for a time. By consent of all parties, depositions of witnesses in the probate proceeding were made part of this record. The testimony of the witnesses establishes the fact that the testator never intended to change his domicile, that during his exile he was merely sojourning in other countries and that the French Government had granted him extraterritorial rights during his stays there. There is no evidence to support the finding that he had abandoned his Iranian domicile and acquired a new domicile in France. There is not the slightest evidence to indicate acquisition of a residence in England.

No proof was submitted in respect of the domicile of the mother of the testator at the time of her death. The proceedings *in* her estate, both here and in France, disclose several attempts to litigate the question of her domicile without conclusive results. Because creditors were entitled to all of the assets in this State, the issue of domicile and the status of those claiming to be her

heirs were never determined in the proceedings here for the settlement of the account of her ancillary administrator. In proceedings in France to have the court declare her domicile in that jurisdiction and appoint a temporary administrator to receive, hold and account for her real and personal property, the court, after an extended recitation of facts, declared itself "incompetent" in the absence of necessary proof. In the pending proceeding, a letter written by her sons was offered as an admission that she settled permanently in France, but the entire document viewed in its setting would provide no basis for a judicial determination that she had abandoned her domicile in Iran and acquired a new one.

No party has argued here that the testator intended that the heirs of the mother be determined under the law of her domicile. The issue as finally submitted is whether the testator intended Iranian law or New York law to govern. Perhaps the domicile of the mother, as between France and Iran, may not be important as respects personal property because in relation to the testator's heirs, the French expert testified that courts in France would look to the nationality of a decedent and if the country of nationality applied its own law of distribution to nationals outside the country, the French courts would apply that law. The Iranian expert testified that the provisions of the Civil Code of Iran governing successions to property are applicable to Iranians residing in foreign countries. However that may be, the court views the question of her domicile as a factor not decisive here because the entire will of the testator indicates his intent to make the heirs of his mother determinable under the law of Iran.

The will begins with directions for the funeral ceremonies and the burial of the testator. It reveals an intent to follow as far as possible the Islamique Schyite rites, as dictated by the traditions of his native land. Further reference to the laws of his nation is made in the observance of requirements of temporary marriage contracts. Finally the great bulk of his property is divided among his mother and his children, the shares corresponding to their rights of forced heirship. The mother was entitled to a one-sixth share under the law of Iran. The will gives her an interest in one sixth of the fund. The balance was bequeathed to the four children. The testator expressly directed a division in five shares, two of which were bequeathed to the son and one each to the daughters. Again, in this division he followed Iranian law.

The Queen Mother, like the testator, lived in exile from her country. The same bonds held both to the traditions and usages of the country over which the family had ruled. The same considerations prevented their return to that country. The gift to the heirs of the mother was intended for those who were the heirs under the law of Iran. The laws of that country determine the persons to take and the value of their shares.

There is no sound basis for the contention that the testator intended the heirs of his mother to be determined under the law of New York. The will appoints a New York executor and expresses a desire that the properties be left where they then were and administered in such manner '' as the Executor might think fit in the interest of the beneficiaries in the place where the funds happen to be at the present time ''. It is true that he probably contemplated *administration* in New York rather than Iran. These provisions, however, form no basis for implication of an intent that a law completely foreign to him and to his mother was to furnish the standard by which the ultimate beneficiaries and the quantum of their shares were to be ascertained.

There is no merit in the contention that the corpus of the fund is not disposed of by the will. The will provides that upon the mother's death, '' this personal estate and other property will go to her direct heirs or to beneficiaries whom she, by her last Will and Testament shall elect.'' It is urged that this should be read as if the testator said: '' to such of her direct heirs or other beneficiaries as she, by her last Will and Testament shall elect ''. That is not what the testator has said, however. He gave the property to her direct heirs or appointees ('' à ses héritiers directe ou aux héritiers qu'elle voudera désigner ''). As heretofore stated the term '' direct heirs '' was possibly intended to distinguish those who would take without an appointment from those who would take under an appointment.

Equally baseless is the argument that the gift of '' this personal estate and other property '' was intended to relate only to jewelry and to real estate in Persia. The subject of the gift to take effect upon her death was the property withheld from her complete ownership during her life, that is, the fund now accounted for.

Finally, it is argued that it has heretofore been judicially determined that New York law governs the construction of this will and that the determination of the heirs under New York law is *res judicata*. It cannot be disputed that this provision of the will has never before been judicially construed. No

prior decision or decree contains an express finding that the interpretation of this will is to be governed by New York law. All that is asserted is that in the construction of another portion of the will and in judicial directions for the administration of the fund, the court's determination was necessarily based upon rules of law of this State. The burden of showing an estoppel by prior adjudication rests upon respondents who assert it. (*Matter of Leonard,* 218 N. Y. 513, 524.) It does not appear that in any of the prior proceedings there was an adversary trial and determination of the issue now litigated and respondents have failed to prove an estoppel by decree.

The court therefore holds that the remainder is to be divided into six parts and that two parts are payable to each of the living sons of the life beneficiary and one part to each of the living daughters.

Submit decree on notice construing the will and settling the account accordingly.