963 P.2d 1124

**In the Matter of the ESTATE OF Ferdinand Edralin MARCOS, deceased.**

**No. 20885.**

Supreme Court of Hawai'i.

Sept. 16, 1998.

Arthur B. Reinwald of Reinwald, O'Connor & Playdon, Bruce L. Lamon, Raymond K. Okada and Judy Y. Lee of Goodsill, Anderson, Quinn & Stifel, and Bruce S. Ross (Pro Hac Vice) of Ross, Sacks & Glazer, on the briefs, for petitioner-appellant Irene L. Silverman.

Richard R. Clifton, Rhonda L.Griswold and Sarah O. Wang of Cades, Schutte, Fleming & Wright, on the briefs, for respondent-appellee Liwayway, Vinzons–Chato, Philippine Special Administratrix.

Sherry P. Broder and Jon M. Van Dyke, on the briefs, for respondents-appellees the Human Rights Plaintiffs.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA, JJ., and HUDDY, Circuit Judge, in place of RAMIL, J., Recused.

NAKAYAMA, Justice.

This case arises out of several attempts by petitioner-appellant Irene L. Silverman and the Golden Budha Corporation (GBC) to open probate proceedings for the Estate of Ferdinand E. Marcos (Marcos Estate) in Hawai'i following Marcos's death on September 29, 1989.

In 1995, GBC, as a creditor of the Marcos Estate, petitioned the circuit court for: (1) an adjudication of intestacy; (2) the opening of probate proceedings; and (3) the appointment of Silverman, a prominent Los Angeles probate lawyer, as personal representative of the Marcos Estate. The circuit court denied the petition in an order filed on July 8, 1996, ruling that it did not have jurisdiction to open probate proceedings because Marcos was not domiciled in Hawai'i and did not have property in Hawai'i at the time of his death.

Subsequently, Silverman petitioned the circuit court for appointment as a special administrator of the Marcos Estate to preserve the estate and secure its proper administration. GBC and the Estate of Roger Roxas joined Silverman's request. The circuit court denied this petition in an order filed on February 24, 1997, ruling that the appointment of a special administrator was not necessary to preserve the estate or to secure its proper administration. The circuit court also noted it had previously ruled that it did not have jurisdiction to open probate proceedings because Marcos was not domiciled in Hawai'i and did not have property in Hawai'i at the time of his death.

The circuit court filed a final judgment dismissing the proceeding on July 7, 1997.

On appeal, Silverman raises the following as points of error: (1) the circuit court erred when it held that it did not have jurisdiction to open probate proceedings because (a) Marcos was domiciled in Hawai'i and (b) Marcos owned property in Hawai'i; and (2) the circuit court erred when it did not appoint Silverman as a special administrator of the Marcos Estate.

We reject Silverman's arguments and affirm: (1) the circuit court's order denying

GBC's petition for adjudication of intestacy and appointment of personal representative, filed July 8, 1996; (2) the circuit court's order denying Silverman's petition for appointment of special administrator and for determination of decedent's residence, filed February 24, 1997; and (3) the final judgment, filed July 7, 1997.

## I. BACKGROUND

### A. MARCOS ARRIVES IN HAWAI'I

Marcos served as President of the Republic of the Philippines from 1965 to 1986. Marcos and his family fled the Philippines for Hawai'i in February, 1986, in the wake of political unrest after he was deposed. Marcos and his wife, Imelda (Imelda), arrived in Honolulu with merchandise and other assets worth about $8.2 million, but these assets were seized by the United States Customs Service (U.S.Customs) upon the Marcoses' entry into the United States and were held by the federal government for the entire period that Marcos resided in Hawai'i.

After his arrival in Hawai'i, Marcos lived in a house in Niu Valley on Kalaniana'ole Highway, and later moved to a house in Makiki Heights. Marcos owned an armored Mercedes Benz 500 SEL limousine.

In an article published in the January 26, 1987 *Honolulu Star–Bulletin,* entitled "Marcos Denies He Plans to Go Back to Manila," Marcos stated that he was not planning to return to the Philippines before the February 2, 1987 plebiscite on a new constitution. There had been continuing reports at this time from Manila that Marcos would return to the Philippines. At the end of the article, Marcos noted that he still desired to return to the Philippines but that, without a passport or the permission of the Philippines or the United States government, it was "impossible."

In an article appearing on September 28, 1989, the *Honolulu Star–Bulletin* noted that, at Marcos's seventy-first birthday party in 1988, he spoke of his " 'glorious' but unfulfilled dream to return to his homeland." The article also noted that "[w]hile Marcos' health visibly diminished during his exile in Hawai['}i, his fervor to return home 'to save' his country as an elder statesman grew stronger."

Marcos lived in Hawai'i continuously for three and a half years until his death in Honolulu on September 29, 1989.

### B. THE HUMAN RIGHTS PLAINTIFFS' SUIT AGAINST MARCOS

After Marcos moved to Hawai'i, a number of lawsuits were filed against him by persons who had been arrested and tortured, or were the families of persons arrested, tortured, and executed in the Philippines between 1971 and 1986 (the Human Rights Plaintiffs). The cases were consolidated in the United States District Court for the District of Hawai'i (the federal district court), and the case was certified as a class action on April 8, 1991. Marcos died during the pendency of the actions, and Imelda and Marcos's son, Ferdinand R. Marcos (Bongbong), were substituted as defendants in the case as "legal representatives" of the Marcos Estate. A consolidated amended complaint naming the Marcos Estate as a defendant was filed on behalf of the class. Imelda and Bongbong were not named as personal representatives of the Marcos Estate in a formal probate proceeding, but were named as "legal representatives" of the Marcos Estate by the federal district court because they were designated as personal representatives of the Marcos Estate in Marcos's will.

On September 24, 1992, after a three week trial on liability, the jury rendered a verdict in favor of the Human Rights Plaintiffs. The jury later awarded the Human Rights Plaintiffs $1.2 billion in exemplary damages and $766 million in compensatory damages. On February 3, 1995, the federal district court entered final judgment in the class action. The decision was affirmed by the Ninth Circuit Court of Appeals in *Hilao v. Estate of Marcos,* 103 F.3d 767 (9th Cir.1996).

### C. GBC'S FIRST ATTEMPT TO OPEN PROBATE IN HAWAI'I

GBC filed a civil suit against Marcos in 1988 in circuit court, eventually obtaining a judgment against the Marcos Estate. In 1990, after Marcos's death, GBC sought to

open probate proceedings in both California and Hawai'i, while its suit against the Marcos Estate was still pending in circuit court. On December 14, 1990, GBC filed a petition for adjudication of intestacy and appointment of personal representative, arguing that the circuit court had jurisdiction to open probate proceedings for the Marcos Estate because Marcos was domiciled in Hawai'i or, alternatively, because Marcos owned property in Hawai'i, specifically the Makiki Heights house and/or the property seized by U.S. Customs. The circuit court denied GBC's petition in an order filed August 2, 1991, ruling that there was no evidence that Marcos was domiciled in Hawai'i or that Marcos owned property in Hawai'i. GBC's motion for reconsideration of the ruling was denied.[1] On the issue of whether Marcos's personal property seized by U.S. Customs provided a basis for domicile, the circuit court stated:

> [T]he property that is the subject of the inquiry in the present petition for reconsideration is not, though it may be in the territorial bounds of the State of Hawai['],i, is not in the Court's opinion, within the state because it is still being held by the United States government. It has not officially been landed in the State of Hawai['],i and cleared, ergo, this Court has no jurisdiction over that property.

### D. THE REPUBLIC OF THE PHILIPPINES OPENS PROBATE IN THE PHILIPPINES.

On October 16, 1992, a probate of the will of Ferdinand E. Marcos for issuance of letters of administration was filed in the Philippine Regional Civil Court. The will was executed on June 23, 1988, and divided Marcos's estate among Imelda and the Marcoses' four children. Imelda and Bongbong were named as joint personal representatives.

In an order filed on September 9, 1994, the Philippine Regional Civil Court appointed respondent-appellee Liwayway Vinzons–Chato, Commissioner of the Internal Revenue Service of the Republic of the Philippines, as the special administratrix of the Marcos Estate to oversee the Marcos Estate until the issue concerning the appointment of a regular administrator could be decided. The Philippine Regional Civil Court confirmed in its order that it had exclusive jurisdiction over the Marcos Estate, stating that:

> The District Court of Hawai['],i cannot assert jurisdiction over the assets of the Estate and exclude the jurisdiction already vested in this Court. Our law on this point is explicit. Section 1 Rule 73 of the Rules of Court so provide in part, to wit:
>
> > "× × ×. The Court first taking cognizance of the settlement of the estate of a decedent, shall exercise jurisdiction to the exclusion of all other courts. × × ×."

> This petition for Probate of the Will of Ferdinand E. Marcos for Issuance of Letters of Administration was filed on October 16, 1992, and that early, jurisdiction was acquired by this Court "to the exclusion of all other courts". A notice of Commencement of Probate Proceedings in a Philippine Court was filed by the petitioner before the Hawai['],i District Court on June 7, 1993 yet no action or reaction was taken thereon by said District Court. Thus, an order categorically declaring that a probate proceeding is pending before this Court is proper in the circumstances here obtaining.

### E. MARCOS'S CREDITORS SEIZE MARCOS'S PROPERTY.

#### 1. THE U.S. CUSTOMS PROPERTY

The Republic of the Philippines, by the Central Bank of the Philippines, filed two actions in the federal district court claiming ownership of the $8.2 million in assets seized from the Marcoses when they first arrived in Hawai'i by U.S. Customs and seeking their return. In light of the dispute regarding proper ownership of the assets, the United States government moved to interplead the assets in the federal actions. The federal district court granted the government's mo-

---

1. The motion for reconsideration was brought by Felix J. Dacanay, the founder of GBC, and not GBC itself. The circuit court denied the motion for reconsideration based on the grounds that Dacanay had no standing to request reconsideration. Apparently this was an oral denial, inasmuch as neither side cites to a written order denying the motion.

tion and assumed constructive custody of the assets, although U.S. Customs retained physical possession.

On December 18, 1992, the federal district court ruled that Roger Roxas and GBC had no interest in the assets and upheld a settlement between Imelda and the Republic of the Philippines. The federal district court found that, although Marcos and Imelda were the joint owners of the property, at Marcos's death, Imelda became the sole owner and had the authority to enter into a settlement by which she agreed to allow the assets to be turned over to the Republic of the Philippines. The federal district court also found that, even assuming, *arguendo*, that Marcos's Estate had an interest in the assets, its claims were not barred from future litigation against the Republic of the Philippines because the Republic of the Philippines would take the assets at the risk of any such future litigation.

### 2. THE MAKIKI HEIGHTS HOUSE

The Republic of the Philippines and GBC brought an action in the federal district court to determine the owner of the Makiki Heights house. In a judgment filed on June 3, 1996, the federal district court ruled that the Makiki Heights house was not an asset of Marcos and was not owned by any member of the Marcos family, but was owned by Lei Investments, Ltd. (Lei Investments), by and for the benefit of Bienvenido R. Tantoco and the Estate of Gliceria R. Tantoco.

The Human Rights Plaintiffs also brought an action in the federal district court against Lei Investments, contending that the Marcos Estate beneficially owned the Makiki Heights house because Lei Investments was a shell corporation created by Marcos to hold and conceal his assets. The Human Rights Plaintiffs and Lei Investments settled this action. In return for the Human Rights Plaintiffs releasing all claims against Lei Investments, Tantoco, and the Estate of Gliceria R. Tantoco, $1,000,000.00 was deposited

with the federal district court. The deposit of the $1,000,000.00 was made to avoid protracted and costly litigation expenses and was not a concession of liability regarding any of the Human Rights Plaintiffs' claims.[2] Additionally, payment of the $1,000,000.00 did not reduce the amount of the final judgment of the Human Rights Plaintiffs against Marcos.

### 3. TANGIBLE PERSONAL PROPERTY

The federal district court, in an order granting the Human Rights Plaintiffs' motion for a writ of execution and order of sale, filed November 3, 1995, held that the Mercedes Benz was beneficially owned by the Marcos Estate and that it was to be seized and sold to satisfy a portion of the Human Rights Plaintiffs' final judgment against the Marcos Estate. The Mercedes Benz was seized by the United States Marshall's Office and sold by the government for $30,000.00. The $30,000.00 was deposited with the clerk of the federal district court in the name of the Human Rights Plaintiffs.[3]

### F. GBC'S SECOND ATTEMPT TO OPEN PROBATE IN HAWAI'I

On May 1, 1995, GBC again attempted to open a probate proceeding in Hawai'i, filing another petition for adjudication of intestacy and appointment of personal representative (Second Probate Petition). GBC repeated its arguments that the circuit court had jurisdiction to open probate proceedings because Marcos was domiciled in Hawai'i or because he owned property in Hawai'i, specifically the Makiki Heights house and/or the property seized by U.S. Customs. On December 29, 1995, GBC filed an amendment to the Second Probate Petition, requesting that the circuit court appoint Silverman as the personal representative of the Marcos Estate. In addition, GBC also argued that because Marcos owned the Mercedes Benz, it was property in

---

2. Although the money was held by the federal district court, it was held for the benefit of the Human Rights Plaintiffs. It appears that the federal district court held in trust the money collected in satisfaction of the Human Rights

Plaintiffs' judgment against the Marcos Estate and at some point in the future would divide the money amongst the Human Rights Plaintiffs.

3. *See supra* note 2.

Hawai'i allowing the circuit court to open a probate proceeding in Hawai'i.

The hearing on the Second Probate Petition was held on May 9, 1996. At the hearing, GBC conceded that the Makiki Heights house was not owned by Marcos and could not be used as a basis for probate jurisdiction. After hearing the arguments of counsel, the circuit court ruled that it was "unable to find that [Marcos] was domiciled in the State of Hawai[']i or had property that was located in the State of Hawai[']i at the time of his death" and denied the Second Probate Petition in an order filed July 8, 1996. Silverman and GBC sought reconsideration of the circuit court's order, which was denied in an order filed September 13, 1996.

### G. *SILVERMAN'S ATTEMPT TO BE NAMED SPECIAL ADMINISTRATOR*

In an order filed May 23, 1996, the California superior court appointed Silverman as the administrator of the Marcos Estate in California. The superior court based its ruling on its belief that Marcos owned property in California, specifically, a house in Beverly Hills, stock in California corporations, and bank accounts in California banks. However, the California Court of Appeal vacated Silverman's appointment in an order filed August 29, 1997, ruling that there was no evidence that Marcos owned any property in California. The California Supreme Court denied Silverman's petition for review of the California Court of Appeal's decision in an order filed December 10, 1997.

On November 14, 1996, Silverman petitioned the circuit court for appointment as special administrator and a determination that Marcos resided in Hawai'i at his death (Petition for Special Administrator), contending that the appointment of a special administrator was necessary: (1) "to preserve the estate of the decedent and to secure its proper administration"; and (2) "so that the Swiss banks and other custodians of estate assets abroad can have a primary probate administration to which they can properly deliver such assets." In an order filed February 24, 1997, the circuit court denied the Petition for Special Administrator, ruling

that "the appointment of a special administrator is not necessary in this case to preserve the estate or to secure its proper administration[.]" The circuit court also noted that it had previously ruled that Marcos was not domiciled in Hawai'i and had no property in Hawai'i at the time of his death.

On July 7, 1997, based on the orders denying the Second Probate Petition and the Petition for Special Administrator, the circuit court entered final judgment ending all proceedings in this probate matter.

Silverman timely appealed from the circuit court's final judgment.

### II. *STANDARD OF REVIEW*

"A [circuit] court's findings of fact are reviewed to see if they are clearly erroneous[.]" *Furukawa v. Honolulu Zoological Society*, 85 Hawai'i 7, 12, 936 P.2d 643, 648, *reconsideration denied*, 85 Hawai'i 196, 940 P.2d 403 (1997) (citing *Hirono v. Peabody*, 81 Hawai'i 230, 232, 915 P.2d 704, 706 (1996)). "A finding of fact is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been committed." *Aickin v. Ocean View Inv. Co., Inc.*, 84 Hawai'i 447, 453, 935 P.2d 992, 998 (1997) (quoting *Dan v. State*, 76 Hawai'i 423, 428, 879 P.2d 528, 533 (1994)).

"[C]onclusions of law are reviewed under the right/wrong standard." *Furukawa*, 85 Hawai'i at 12, 936 P.2d at 648 (citing *Peabody*, 81 Hawai'i at 232, 915 P.2d at 706). Under the *de novo* or right/wrong standard, this court "examine[s] the facts and answer[s] the question without being required to give any weight to the trial court's answer to it." *Aickin*, 84 Hawai'i at 453, 935 P.2d at 998 (ellipsis and citations omitted). "[A] conclusion of law is not binding upon the appellate court and is freely reviewable for its correctness." *Tabieros v. Clark Equipment Co.*, 85 Hawai'i 336, 350, 944 P.2d 1279, 1293 (1997) (citations and internal quotation marks omitted).

III. *DISCUSSION*

A. *THE CIRCUIT COURT DID NOT ERR WHEN IT RULED THAT IT DID NOT HAVE JURISDICTION TO OPEN PROBATE PROCEEDINGS.*

Silverman argues that the circuit court erred when it ruled that it did not have jurisdiction to open probate proceedings because: (1) Marcos was domiciled in Hawai'i; and (2) Marcos owned property in Hawai'i. We disagree and affirm the circuit court's ruling that it did not have jurisdiction to open probate proceedings.

Hawai'i Revised Statutes (HRS) § 560:1–301 (Supp.1997)[4] covers the jurisdiction of the circuit court in probate matters and provides in pertinent part:

Except as otherwise provided in this chapter, this chapter applies to:

(1) *The affairs and estates of decedents,* missing persons, and persons to be protected, *domiciled in this State;* [and]

(2) *The property of nonresidents located in this State* or property coming into the control of a fiduciary who is subject to the laws of this State[.]

(Emphases added.)

1. *MARCOS WAS NOT DOMICILED IN HAWAI'I.*

We discussed the establishment of domicile in Hawai'i in *Arakaki v. Arakaki,* 54 Haw. 60, 502 P.2d 380 (1972).

Domicile is proved by evidence of two facts: physical presence at a particular place *and intention of the party to reside there permanently;* or, as is sometimes said, *to make the place his home with no present intent to leave at any foreseeable future time.*

*Id.* at 62, 502 P.2d at 382 (quoting *Blackburn v. Blackburn,* 41 Haw. 37, 40–41 (1955)) (emphases added). " 'In order to acquire new domicile there must be residence or bodily presence in the new location and an intention to remain; act and intent must concur; *in*

addition there must be an intention to abandon the old domicile.' " *Yamane v. Piper,* 51 Haw. 339, 340, 461 P.2d 131, 132 (1969) (quoting *Powell v. Powell,* 40 Haw. 625, 629 (1954)) (emphasis added); *see also Whitehead v. Whitehead,* 53 Haw. 302, 308, 492 P.2d 939, 943 (1972) ("A person establishes his domicile in a state by being physically present there with the intention of remaining indefinitely."); *Estate of Grant,* 34 Haw. 559, 562–63 (1938) (woman who bought home in Hawai'i for health reasons and lived in Hawai'i at her death continued to be domiciled in California given her intention to ultimately return to California); *In re Kadjar's Estate,* 200 Misc. 268, 102 N.Y.S.2d 113, 119 (N.Y. Surrogate's Ct.1950), *aff'd,* 279 A.D. 1008, 113 N.Y.S.2d 245 (N.Y.App.Div.), *appeal denied,* 280 A.D. 777, 113 N.Y.S.2d 678 (N.Y.App.Div.1952) (Former Shah of Persia, who fled the country upon his government's overthrow and who spent remaining seven years of his life in various European countries, primarily France, retained Iranian domicile because there was no proof he intended to abandon his Iranian domicile). " '[A] domicile once established is presumed to continue and one alleging that a change has taken place has the burden of proof.' " *Arakaki,* 54 Haw. at 62, 502 P.2d at 382 (quoting *Blackburn,* 41 Haw. at 41).

█ It is undisputed that Marcos was domiciled in the Philippines prior to his ouster. Therefore, Silverman has the burden of proving that Marcos changed his domicile from the Philippines to Hawai'i during his exile from the Philippines. Silverman did not meet this burden because she did not show that Marcos intended to reside in Hawai'i permanently with the intent to abandon his domicile in the Philippines.

Marcos lived continuously in Hawai'i during his three-and-a-half year exile, but the record reflects that Marcos never intended to make Hawai'i his permanent home. Marcos remained in Hawai'i and could not return to the Philippines because he was denied permission to return by the Philippine and Unit-

4. HRS § 560:1–301 was amended in 1996; however, its amendment did not affect its application

in this case.

ed States governments. The evidence showed that Marcos considered the Philippines his home and intended to return there as soon as the political situation allowed. He retained his Philippine citizenship, left real and personal property in the Philippines, and repeatedly stated that he wanted to return to his home in the Philippines. Marcos lived in Hawaiʻi only because he was not permitted by the Philippine and United States governments to return to the Philippines prior to his death.

In support of her argument that Marcos intended to remain in Hawaiʻi permanently, Silverman points to an article in the January 26, 1987 *Honolulu Star–Bulletin,* entitled "Marcos Denies He Plans to Go Back to Manila," in which Marcos stated that he was not planning to return to the Philippines before the February 2, 1987 plebiscite on a new constitution. Marcos only stated that he would not return to the Philippines during that period, but never ruled out a future return to the Philippines. In the same article, Marcos stated that he still desired to return to the Philippines. Silverman did not support her argument with any other evidence that Marcos planned to make Hawaiʻi his permanent home and abandon his domicile in the Philippines.

Silverman's reliance on *Yamane, supra,* is misplaced. In *Yamane,* the defendant established a new domicile on Wake Island when he took a job on Wake Island pursuant to a two-year job contract and took his family and property with him. *Yamane,* 51 Haw. at 341, 461 P.2d at 132. However, *Yamane* is distinguishable from this case, because in *Yamane,* the defendant left Hawaiʻi "with the intention of abandoning his residence in Hawaiʻi, residing indefinitely on Wake Island, and seeking a position somewhere on the mainland should his tour of duty there come to an end." *Id.* at 340, 461 P.2d at 132. In the case at bar, although Marcos did move to Hawaiʻi with $8.2 million in possessions and his family, he left property behind in the Philippines, never had the stated intention of abandoning his domicile in the Philippines, and repeatedly spoke of returning to the Philippines.

 Similarly, Silverman's argument that Marcos was domiciled in Hawaiʻi because he was subject to jurisdiction in Hawaiʻi courts should be rejected. Silverman argues that, because Marcos was the defendant in two suits brought in Hawaiʻi, he was subject to the laws and judicial system of Hawaiʻi during the time he lived in Hawaiʻi, and this demonstrated that Marcos had established domicile in Hawaiʻi. The fact that Hawaiʻi courts had *in personam* jurisdiction over Marcos indicated that Marcos had sufficient "minimum contacts" with Hawaiʻi such that the maintenance of the suits did not offend " 'traditional notions of fair play and substantial justice.' " *In re Doe, Born on August 6, 1987,* 83 Hawaiʻi 367, 373, 926 P.2d 1290, 1296 (1996) (quoting *Shaw v. North Am. Title Co.,* 76 Hawaiʻi 323, 326, 876 P.2d 1291, 1294 (1994)) (quoting *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)). However, in order to prove domicile, Silverman must not only prove that Marcos was present in Hawaiʻi, but that he had an intent to remain in Hawaiʻi. *See Whitehead,* 53 Haw. at 308, 492 P.2d at 943 (intent to remain shown by intent to remain in current residence indefinitely); *Yamane,* 51 Haw. at 340, 461 P.2d at 132 (intent to remain shown by intent to abandon the old domicile). Silverman has failed to show that Marcos possessed the requisite intent.

Accordingly, given the circumstances underlying Marcos's exile and Marcos's repeated statements of his intent to return to his Philippine homeland, Silverman has failed to show that Marcos intended to live in Hawaiʻi permanently or that he abandoned his domicile in the Philippines, and the circuit court correctly ruled that Marcos was not domiciled in Hawaiʻi.

## 2. *MARCOS DID NOT OWN PROPERTY LOCATED IN HAWAIʻI*

Silverman contends that the circuit court erred when it held that Marcos owned no property in Hawaiʻi at the time of his death. Specifically, Silverman argues that Marcos owned the following property in Hawaiʻi: (1) the Makiki Heights house; (2) $75,000.00 in art and furniture that was kept at the Makiki Heights house; (3) the property held by U.S.

Customs; and (4) the Mercedes Benz. We disagree.

### a. *THE MAKIKI HEIGHTS HOUSE*

■ The federal district court held that the Makiki Heights house was not owned by the Marcos Estate, but rather by Lei Investments. Silverman does not dispute this ruling. However, Silverman appears to argue that the $1,000,000.00 paid by Lei Investments to settle its claim with the Human Rights Plaintiffs was property owned in Hawai'i by the Marcos Estate because it was a liquidation of an estate asset, the Makiki Heights house.

However, it is difficult to discern the rationale of this conclusory argument when it is not disputed that Lei Investments owned the Makiki Heights house. Furthermore, in the settlement between the Human Rights Plaintiffs and Lei Investments, $1,000,000.00 was deposited with the federal district court. The deposit of the $1,000,000.00 was made to avoid protracted and costly litigation expenses, and was not a concession of liability by Lei Investments for any of the Human Rights Plaintiffs' claims. The settlement was not an admission by Lei Investments that the Marcos Estate owned the house and did not reduce the final judgment the Human Rights Plaintiffs had obtained against the Marcos Estate. The Marcos Estate was not a party to the settlement and cannot claim to own the $1,000,000.00, because it is owned by the Human Rights Plaintiffs. Silverman fails to show how the $1,000,000.00 represents a liquidation of the Makiki Heights house much less how the house was owned by the Marcos Estate. Accordingly, the settlement was not property in Hawai'i owned by the Marcos Estate providing jurisdiction for opening probate proceedings.

### b. *THE $75,000.00 IN ART AND FURNITURE KEPT AT THE MAKIKI HEIGHTS HOUSE*

■ Silverman argues that there was $75,000.00 in art and furniture kept at the Makiki Heights house and owned by Marcos. In support of this claim, Silverman cites to a United States Internal Revenue Service (IRS) unpaid tax assessment. However, the IRS tax assessment does not support Silverman's claim. The tax assessment does not state that it valued any possessions of Marcos, and, in fact, is not even for $75,000.00. It is a tax lien against the Marcos Estate for $56 million. Nowhere in the lien is art, furniture, or $75,000.00 even mentioned. Silverman cites no other evidence in the record that Marcos possessed $75,000.00 in art and furniture at the Makiki Heights house and does not offer evidence that the art and furniture ever existed, much less that Marcos owned it.

### c. *THE PROPERTY HELD BY U.S. CUSTOMS*

■ Upon arriving in Hawai'i in 1986, U.S. Customs seized $8.2 million in property from the Marcoses. Silverman argues that, because U.S. Customs had possession of this property in Hawai'i, the Marcos Estate therefore owned property in Hawai'i at the time of Marcos's death. Therefore, the circuit court had jurisdiction over this property and could open probate proceedings, pursuant to HRS § 560:1–301(2). We reject this argument.

■ Although there is no Hawai'i case law on the issue of whether the circuit court has jurisdiction over property in the custody of the federal government, federal case law dictates that the circuit court does not have jurisdiction over property in the custody of the federal government. In *United States v. $119,000 in U.S. Currency*, 793 F.Supp. 246 (D.Haw.1992), the federal district court held that the circuit court could not exercise *in rem* jurisdiction over property that was in federal custody at the time of the circuit court proceeding. *Id.* at 250. We agree with the federal district court and hold that property in the custody of the federal government is not subject to Hawai'i state courts' jurisdiction where the property was in custody at the time of the Hawai'i state court proceeding. Therefore, inasmuch as the property held by U.S. Customs was in federal custody at the time of all of the circuit court proceedings, it may not serve as the jurisdictional basis for a Hawai'i probate proceeding pursuant to HRS § 560:1–301(2).

### d. THE MERCEDES BENZ

■ Silverman argues that the Mercedes Benz, allegedly owned by Marcos and located in Hawai'i at the time of his death, constituted "property" owned in Hawai'i, which, in turn, would confer jurisdiction for the circuit court to open probate of the Marcos Estate. We reject this argument.

Although the Mercedes Benz was located in Hawai'i at the time of Marcos's death, after his death the federal government executed against the Mercedes Benz, and it was sold for $30,000.00. The proceeds were deposited in the federal district court in the name of the Human Rights Plaintiffs to partially satisfy their judgment against the Marcos Estate in their federal district court action. The circuit court does not have the jurisdiction to open probate based on the $30,000.00 because it belongs to the Human Rights Plaintiffs.[5] Insofar as the Mercedes Benz was sold and the $30,000.00 proceeds of the sale are owned by the Human Rights Plaintiffs, we hold that the Mercedes Benz may not serve as the jurisdictional basis for a Hawai'i probate proceeding pursuant to HRS § 560:1–301(2).

### C. THE CIRCUIT COURT DID NOT ERR WHEN IT DENIED THE PETITION FOR SPECIAL ADMINISTRATOR.

Silverman argues that the circuit court erred when it denied the Petition for Special Administrator, because: (1) the circuit court erroneously concluded that Marcos was not domiciled and had no property in Hawai'i; and (2) a special administrator was needed in this case to gather and preserve Marcos Estate assets world-wide because some creditors and heirs were pursuing self-help remedies that were liquidating assets of the Marcos Estate to the detriment of those creditors and heirs who were waiting for a valid and neutral probate proceeding. These arguments are without merit.

HRS § 560:3–614 (Supp.1997)[6] governs when a special administrator may be appointed in a probate proceeding and provides in pertinent part:

A special administrator may be appointed:
. . .
(2) In a formal proceeding by order of the court *on the petition of any interested person* and finding, after notice and hearing, that appointment is necessary to preserve the estate or to secure its proper administration including its administration in circumstances where a general personal representative cannot or should not act. If it appears to the court that an emergency exists, appointment may be ordered without notice.

(Emphasis added.)

As stated previously in parts III.A and III.B, *supra,* Marcos was not domiciled in Hawai'i and did not have property in Hawai'i that could have served as the jurisdictional basis for a Hawai'i probate proceeding pursuant to HRS § 560:1–301(2). Therefore, because the Marcos Estate owned no assets in Hawai'i, there was no basis for opening a probate proceeding in Hawai'i and no grounds for appointing a special representative.

Although the point is moot, we will address Silverman's argument that the circuit court should have appointed her as special administrator of the Marcos Estate in order to provide guidance to the circuit court on the issue of who may be considered an "interested person."

■ Even if Silverman could prove there was property of the Marcos Estate in Hawai'i, a special administrator may only be appointed on the petition of any "interested

---

5. Silverman argues that "[a] creditor should not be able to defeat probate law, and the legitimate claims of other estate creditors, by liquidating estate assets before probate is opened." However, if Silverman is challenging the validity of the federal government's execution against the Mercedes Benz, this is the wrong forum in which to raise the issue. Silverman should challenge the federal government's execution against the Mercedes Benz in the federal district court or appeal the decision to the Ninth Circuit Court of Appeals. Silverman could also raise the issue in the Philippine Regional Civil Court, where Marcos's will is being probated.

6. HRS § 560:3–614 was amended in 1996; however, its amendment did not affect its application to this case.

person." HRS § 560:1–201 (Supp.1997)[7] defines "interested person" as the following:

"Interested person" includes heirs, devisees, children, spouses or reciprocal beneficiaries, creditors, beneficiaries, and any others having a property right in or claim against a trust estate or the estate of a decedent, ward, or protected person. It also includes persons having priority for appointment as personal representative, and other fiduciaries representing interested persons. The meaning as it relates to particular persons may vary from time to time and must be determined according to the particular purposes of, and matter involved in, any proceeding.

Silverman had no familial relationship to the Marcos family, did not have a property right or claim against the Marcos Estate, and did not have priority to be appointed as personal representative of the Marcos Estate.[8]

Silverman argues that she was an interested person because she had been appointed the administrator of the Marcos Estate in California. However, Silverman's appointment was vacated by the California Court of Appeal, and she is no longer the administrator of the Marcos Estate in California. Although at the time she filed the petition to be appointed special administrator in Hawaiʻi, Silverman was arguably an interested person because she was a fiduciary representing interested persons (GBC and other California creditors), she is no longer the administrator of the Marcos Estate in California, and, therefore, no longer an interested person.[9] Consequently, Silverman was not an interested person and did not have the standing to bring a petition for the appointment of a special administrator for the Marcos Estate in Hawaiʻi, and the circuit court did not err when it denied the Petition for Special Administrator.[10]

## IV. CONCLUSION

For the foregoing reasons, we affirm: (1) the circuit court's order denying GBC's peti-

---

7. HRS § 560:1–201 was amended in 1996 and 1997 to add "reciprocal beneficiaries" to the class of people who could bring a petition for a special administrator; this amendment to HRS § 560:1–201 did not affect its application to this case.

8. HRS § 560:3–203 (Supp.1997) covers priority among persons seeking appointment as personal representative. Although amended in 1996 and 1997, its amendment did not affect its application to this case. It provides in pertinent part:

 (a) Whether the proceedings are formal or informal, persons who are not disqualified have priority for appointment in the following order:
 (1) The person with priority as determined by a probated will including a person nominated by a power conferred in a will;
 (2) The surviving spouse or reciprocal beneficiary of the decedent who is a devisee of the decedent;
 (3) Other devisees of the decedent;
 (4) The surviving spouse or reciprocal beneficiary of the decedent;
 (5) Other heirs of the decedent; and
 (6) Forty-five days after the death of the decedent, any creditor.
 . . .
 (e) Appointment of one who does not have priority, including priority resulting from renunciation or nomination determined pursuant to this section, may be made only in formal proceedings. Before appointing one without priority, the court must determine that those having priority, although given notice of the proceed-

ings, have failed to request appointment or to nominate another for appointment, and that administration is necessary.

9. GBC and the Estate of Roger Roxas, who joined in the Petition for Special Administrator and sought appointment of Silverman as a special administrator of the Marcos Estate, were interested persons as creditors of the Marcos Estate. However, neither of these parties appealed from the order denying the Petition for Special Administrator.

10. Silverman further argues that the opening of probate proceedings in the Philippines is a "sham" because the Philippine government's intent was "to avoid a fair and order[ly] probate of the Marcos Estate at all costs" and Vinzons–Chato, as the special administrator of the Marcos Estate appointed by the Philippine Regional Civil Court, "has taken no action to protect the rights of any other creditors of the Marcos Estate." In addition, Silverman argues that the appointment of Vinzons–Chato as special administrator of the Marcos Estate creates a conflict of interest because Vinzons–Chato is the Commissioner of the Internal Revenue Service of the Republic of the Philippines, allegedly the Marcos Estate's largest creditor. However, the proper forum to raise these concerns is the Philippine Regional Civil Court, not the Hawaiʻi circuit court, especially in light of our holding in this case that the circuit court had no jurisdiction to open probate proceedings because Marcos was not domiciled in Hawaiʻi and had no property in Hawaiʻi.

tion for adjudication of intestacy and appointment of personal representative, filed July 8, 1996; (2) the circuit court's order denying Silverman's petition for appointment of special administrator and for determination of decedent's residence, filed February 24, 1997; and (3) the final judgment, filed July 7, 1997.